UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

OCT   9 2008

David J. Bradley, Clerk of Court

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, EX REL. MICHAEL N. SWETNAM, JR., | §§§§§ | |
| Plaintiff, | §§ | B - 08 - 4 4 6 |
| VS. | §§ | CASE NO. _____ |
| VALLEY BAPTIST HEALTH SYSTEM AND VALLEY BAPTIST MEDICAL CENTER, | §§§§ | |
| Defendants. | §§ | |

ORIGINAL COMPLAINT (SEALED) *Un-* *11-5-10*

COMES NOW, the United States of America, ex rel. Michael N. Swetnam, Jr., by and through its attorney of record, and for its Complaint states:

## JURISDICTION AND VENUE

1.     This action arises under the False Claims Act, as amended, 31 U.S.C. §§ 3729-33, and under common law theories of payment by mistake of fact, unjust enrichment and fraud. This Court has jurisdiction over this action under 31 U.S.C. § 3730(a) and 28 U.S.C. §§ 1345 and 1367(a).

2.     Venue is proper in the Southern District of Texas, Brownsville Division, pursuant to 28 U.S.C. § 1391(b) and 31 U.S.C. § 3732(a).

## PARTIES

3.     Plaintiff the United States of America, acting through the Department of Health and Human Services (hereinafter "HHS"), administers the Health Insurance Program for the Aged and Disabled established by Title XVIII of the Social Security Act (hereinafter "Act"), 42

ORIGINAL COMPLAINT (SEALED) – Page 1

U.S.C. §§ 1395 *et seq.* (hereinafter "Medicare"), and Grants to States for Medical Assistance Programs pursuant to Title XIX of the Act, 42, U.S.C. §§ 1396 *et seq.* (hereinafter "Medicaid").

4.      Relator Michael N. Swetnam, Jr. is an individual with a principal residential address of █████████████████ Los Fresnos, Cameron County, Texas.

5.      Defendant Valley Baptist Health System is an integrated healthcare delivery system that was incorporated on August 29, 2000 as a 501(c)(3) non-profit corporation with its principal place of business located at 2101 Pease Street, Harlingen, Cameron County, Texas 78550.  Defendant Valley Baptist Health System is within and/or has done business within the jurisdiction of the Court and operates under the control of the Baptist General Convention of Texas.

6.      Defendant Valley Baptist Medical Center is a wholly owned and controlled subsidiary of Valley Baptist Health System and has been incorporated as a 501(c)(3) non-profit corporation with its principal place of business located at 2101 Pease Street, Harlingen, Cameron County, Texas 78550.  Defendant Valley Baptist Medical Center is within and/or has done business within the jurisdiction of the Court and operates under the control of the Baptist General Convention of Texas.

## THE LAW

7.      The False Claims Act (FCA) provides, in pertinent part that:

(a)      Any person who (1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval; (2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government; (3) conspires to defraud the Government by getting a false or fraudulent claim paid or approved by the Government; . . . or (7) knowingly makes, uses, or causes to be made or

used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government,

\* \* \*

is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages which the Government sustains because of the act of that person. . .

(b)     For purposes of this section, the terms "knowing" and "knowingly" mean that a person, with respect to information (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the trust or falsity of the information; or (3) acts in reckless disregard of the trust or falsity of the information, and no proof of specific intent to defraud is required.

31 U.S.C. § 3729.

8.     The Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), arose out of congressional concern that payoffs to those who can influence healthcare decisions would result in goods and services being provided that are medically unnecessary, of poor quality, or even harmful to a vulnerable patient population.  To protect the integrity of the program from these difficult-to-detect harms, Congress enacted a *per se* prohibition against the payment of kickbacks in any form, regardless of whether the particular kickback gave rise to over utilization or poor quality of care.  First enacted in 1972, Congress strengthened the statute in 1977 and 1987 to ensure that kickbacks masquerading as legitimate transactions did not evade its reach.  *See,* Social Security Amendments of 1972, Pub. L. No. 92-603, §§242(b) and (c); 42 U.S.C. § 1320a-76, Medicare-Medicaid Antifraud and Abuse Amendments, Pub. L. No. 95-142; Medicare and Medicaid Patient and Program Protection Act of 1987, Pub. L. No. 100-93.

9.     The Anti-Kickback Statute prohibits any person or entity from making or accepting payment to induce or reward any person for referring, recommending or arranging for

federally-funded medical services, including services provided under the Medicare and Medicaid

programs.

        (b)     Illegal remuneration

* * *

        (2) whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person –

        (A)   to refer an individually to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or

        (B)   to purchase, lease, order or arrange for or recommend purchasing, leasing or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program,

        shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

42 U.S.C. § 1320a-7b(b). Violation of the statute can also subject the perpetrator to exclusion

from participation in federal health care programs and, effective August 6, 1997, civil monetary

penalties of $50,000 per violation and three times the amount of remuneration paid. 42 U.S.C. §

1320a-7(b)(7) and 42 U.S.C. § 1320a-7a(a)(7).

       10.    The Anti-Kickback Statute does provide several very specific "safe harbors" for

arrangements and/or payment practices that do not constitute violations of the Statute. For

example, amongst others, the Anti-Kickback Statute and Code of Federal Regulations provide

"safe harbor" protection for certain –

(a)     space rental agreements (42 U.S.C. § 1320a-7b(b)(3)(E) and 42 C.F.R. § 1001.952(b));

(b)     equipment rental agreements (42 U.S.C. § 1320a-7b(b)(3)(E) and 42 C.F.R. § 1001.952(c));

(c)     personal services and management contracts (42 U.S.C. § 1320a-7b(b)(3)(E) and 42 C.F.R. § 1001.952(d));

(d)     physician recruitment arrangements (42 U.S.C. § 1320a-7b(b)(3)(E) and 42 C.F.R. § 1001.952(n));

(e)     increased coverage, reduced cost-sharing amounts or reduced premium amounts offered to certain health plans to enrollees (42 U.S.C. § 1320a-7b(b)(3)(E) and 42 C.F.R. § 1001.952(l));

(f)     referral services (42 U.S.C. § 1320a-7b(b)(3)(E) and 42 C.F.R. § 1001.952(f));

(g)     subsidies for obstetrical malpractice insurance in underserved areas (42 U.S.C. § 1320a-7b(b)(3)(E) and 42 C.F.R. § 1001.952(o));

(h)     specialty referral arrangements between providers (42 U.S.C. § 1320a-7b(b)(3)(E) and 42 C.F.R. § 1001.952(s)); and

(i)     cooperative hospital services organizations (42 U.S.C. § 1320a-7b(b)(3)(E) and 42 C.F.R. § 1001.952(q)).

11.     Importantly, each statutory "safe harbor" carries a long list of applicable standards that must be met before the "safe harbor" protection applies. *See* 42 U.S.C. § 1320a-7b(b)(3)(E) and 42 C.F.R. § 1001.952.

12.     As detailed below, Defendants' actions do not meet the required standards for application of the Anti-Kickback Statute's "safe harbor" protection.

13.     Enacted as amendments to the Social Security Act, 42 U.S.C. § 1395nn (commonly known as the "Stark Statute") prohibits a hospital (or other entity providing healthcare items or services) from submitting Medicare claims for payment based on patient

referrals from physicians having a "financial relationship" (as defined in the statute) with the hospital. The regulations implementing 42 U.S.C. § 1395nn expressly require that any entity collecting payment for a healthcare service "performed under a prohibited referral must refund all collected amounts on a timely basis." 42 C.F.R. § 411.353.

14.     The Stark Statute establishes the clear rule that the United States will not pay for items or services prescribed by physicians who have improper financial relationships with other providers. The statute was designed specifically to reduce the loss suffered by the Medicare program due to such increased questionable utilization of services.

15.     Congress enacted the Stark Statute in two parts, commonly known as Stark I and Stark II. Enacted in 1989, Stark I applied to referrals of Medicare patients for clinical laboratory services made on or after January 1, 1992, by physicians with a prohibited financial relationship with the clinical lab provider. *See* Omnibus Budget Reconciliation Act or 1989, P.L. 101-239, § 6204.

16.     In 1993, Congress extended the Stark Statute (Stark II) to referrals for ten additional designated health services. *See* Omnibus Reconciliation Act of 1993, P.L. 103-66, § 13562, Social Security Act Amendments of 194, P.L. 103-432, § 152.

17.     As of January 1, 1995, Stark II applied to patient referrals by physicians with a prohibited financial relationship for the "designated health services" which included inpatient and outpatient health services. *See* 42 U.S.C. § 1395nn(h)(6).

18.     In pertinent part, the Stark Statute provides:

      (a)     Prohibition of certain referrals

      (1)     In general

Except as provided in subsection (b) of this section, if a physician (or an immediate family member of such physician) has a financial relationship with an entity specified in paragraph (2), then –

> (A)   the physician may not make a referral to the entity for the furnishing of designated health services for which payment otherwise may be made under this subchapter, and

> (B)   the entity may not present or cause to be presented a claim under this subchapter or bill to any individual, third party payor, or other entity for designated health services furnished pursuant to a referral prohibited under subparagraph (A).

42 U.S.C. § 1395nn.

19.    The Stark Statute broadly defines prohibited financial relationships to include any "compensation" paid directly or indirectly to a referring physician. The statute's exceptions then identity specific transactions that will not trigger its referral and billing prohibitions.

20.    For example, amongst others, the Stark Statute and Code of Federal Regulations provide exceptions for certain –

> (a)   publicly traded securities (42 U.S.C. § 1395nn(c) and 42 C.F.R. § 411.356(a) and (b));

> (b)   space rental (42 U.S.C. § 1395nn(e)(1)(A) and 42 C.F.R. § 411.357(a));

> (c)   equipment rental (42 U.S.C. § 1395nn(e)(1)(B) and 42 C.F.R. § 411.357(b));

> (d)   personal services and management contracts (42 U.S.C. § 1395nn(e)(3)(A) and 42 C.F.R. § 411.357(d)(1));

> (e)   isolated transactions including acquisitions of physician practices (42 U.S.C. § 1395nn(e)(6) and 42 C.F.R. § 411.357(f));

> (f)   physician incentive plans (42 U.S.C. § 1395nn(e)(3)(B) and 42 C.F.R. § 411.357(d)(2));

(g)     risk sharing arrangements (42 U.S.C. § 1395nn(b)(4) and 42 C.F.R. § 411.357(n));

(h)     referral services (42 U.S.C. § 1395nn(b)(4) and 42 C.F.R. § 411.357(q));

(i)     subsidies for obstetrical malpractice insurance in underserved areas (42 U.S.C. § 1395nn(b)(4) and 42 C.F.R. § 411.357(r));

(j)     payments by physicians for items and services (42 U.S.C. § 1395nn(e)(8) and 42 C.F.R. § 411.357(i));

(k)     medical staff incidental benefits (42 U.S.C. § 1395nn(b)(4) and 42 C.F.R. § 411.357(m));

(l)     indirect compensation arrangements (42 U.S.C. § 1395nn(b)(4) and 42 C.F.R. § 411.357(p)); and

(m)     physician retention payments in underserved areas (42 U.S.C. § 1395nn(b)(4) and 42 C.F.R. § 411.357(t).

21.     Like the Anti-Kickback Statute "safe harbors", each statutory exception to the Stark Statute carries a long list of required standards and conditions that must be met before the exception applies. *See* 42 U.S.C. § 1395nn and 42 C.F.R. §§ 411.356 and 411.357. Further, like the Anti-Kickback Statute "safe harbors", as detailed below, Defendants' actions do not meet the standards and conditions required for application of the statutory Stark exceptions.

22.     Violation of the statute may subject the physician and the billing entity to exclusion from participation in federal health care programs and various financial penalties, including (a) a civil money penalty of $15,000 for each service included in a claim for which the entity knew or should have known that payment should not be made under Section 1395nn(g)(1); and (b) an assessment of three times the amount claimed for a service rendered pursuant to a referral the entity knew or should have known as prohibited. *See* 42 U.S.C. §§ 1395nn(g)(3), 1320a-7a(a).

ORIGINAL COMPLAINT (SEALED) – Page 8

## THE MEDICARE AND MEDICAID PROGRAM

23.     In 1965, Congress enacted Title XVIII of the Social Security Act, known as the Medicare program, to pay for the costs of certain healthcare services.  Entitlement to Medicare is based on age, disability or affliction with end-stage renal disease.  *See* 42 U.S.C. §§ 426, 426A. Part A of the Medicare Program authorizes payment for institutional care, including hospital, skilled nursing facility and home health care.  *See* 42 U.S.C. §§ 1395c-1395i-4.

24.     HHS is responsible for the administration and supervision of the Medicare program.  The Centers for Medicare and Medicaid Services (hereinafter "CMS") is an agency of HHS and is directly responsible for the administration of the Medicare program.

25.     Under the Medicare program, CMS makes payments retrospectively (after the services are rendered) to hospitals for inpatient and outpatient services.  Medicare enters into provider agreements with hospitals in order to establish the hospitals' eligibility to participate in the Medicare program.  However, Medicare does not prospectively contract with hospitals to provide particular services for particular patients.  Any benefits derived from those services are derived solely by the patients and not by Medicare or the United States.

26.     As detailed below, Defendants submitted or caused to be submitted claims both for specific services provided to individual beneficiaries and claims for general and administrative costs incurred in treating Medicare beneficiaries.

27.     To assist in the administration of Medicare Part A, CMS contracts with "fiscal intermediaries." 42 U.S.C. § 1395h.  Fiscal intermediaries, typically insurance companies, are responsible for processing and paying claims and cost reports.

28.     Upon discharge of Medicare beneficiaries from a hospital, the hospital submits claims for interim reimbursement for items and services delivered to those beneficiaries during

their hospital stays.  42 C.F.R. §§ 413.1, 413.60, 413.64.  Hospitals submit patient-specific claims for interim payments on a Form UB-92.

29.     As a prerequisite to payment by Medicare, CMS requires hospitals to submit annually a form CMS-2552, more commonly known as the hospital cost report.  Cost reports are the final claim that a provider submits to the fiscal intermediary for items and services rendered to Medicare beneficiaries.

30.     After the end of each hospital's fiscal year, the hospital files its hospital cost report with the fiscal intermediary, stating the amount of reimbursement the provider believes it is due for the year.  *See* 42 U.S.C. § 1395g(a); 42 C.F.R. § 413.20.  *See also* 42 C.F.R. § 405.1801(b)(1).  Hence, Medicare relies upon the hospital cost report to determine whether the provider is entitled to more reimbursement than already received through interim payments, or whether the provider has been overpaid and must reimburse Medicare.  42 C.F.R. §§ 405.1803, 4136.60 and 413.64(f)(1).

31.     Defendants were, at all times relevant to this Complaint, required to submit annually a hospital cost report to the fiscal intermediary.

32.     During the relevant time period, Medicare payments for hospital services were determined by the claims submitted by the provider for particular patient discharges (specifically listed on UB-92s) during the course of the fiscal year.  On the hospital cost report, this Medicare liability for services is then totaled with any other Medicare liabilities to the provider.  This total determines Medicare's true liability for services rendered to Medicare beneficiaries during the course of a fiscal year.  From this sum, the payments made to the provider during the year are subtracted to determine the amount due to the Medicare program or the amount due to the provider.

33.     Under the rules applicable at all times relevant to this Complaint, Medicare, through its fiscal intermediaries, had the right to audit the hospital cost reports and financial representations made by Defendants to ensure their accuracy and preserve the integrity of the Medicare Trust Funds.  This right includes the right to make retroactive adjustments to hospital cost reports previously submitted by a provider if any overpayments have been made.  42 C.F.R. § 413.64(f).

34.     Every hospital cost report contains a "Certification" that must be signed by the chief administrator of the provider or a responsible designee of the administrator.

35.     At all times relevant to this Complaint, the hospital cost report certification page included a notice that misrepresentation or falsification of any information contained in the cost report may be punishable by criminal, civil and administrative action, fine and/or imprisonment under federal law.  Furthermore, the hospital cost report certification page included notice that if services identified in the report were provided or procured through the payment directly or indirectly of a kickback or were otherwise illegal, criminal, civil and administrative action, fines and/or imprisonment may result.

36.     At all times relevant to this Complaint, the responsible provider official was required to certify, in pertinent part:

> "to the best of my knowledge and belief, it [the hospital cost report] is a true, correct and complete statement prepared from the books and records of the provider in accordance with applicable instructions except as noted.
>
> I further certify that I am familiar with the laws and regulations regarding the provision of health care services, and that the services identified in this cost report were provided in compliance with such laws and regulations."

37.     Thus, the provider was required to certify that the filed hospital cost report is (1) truthful, *i.e.*, that the cost information contained in the report is true and accurate; (2) correct, *i.e.*, that the provider is entitled to reimbursement for the reported costs in accordance with applicable instructions; (3) complete, *i.e.*, that the hospital cost report is based upon all information known to the provider; and (4) that the services provided in the cost report were not affected by kickbacks and were billed in compliance with the Stark Statute.

38.     A hospital is required to disclose all known errors and omissions in its claims for Medicare reimbursement (including its cost reports) to its fiscal intermediary.   42 U.S.C. § 1320a-76(a)(3) specifically creates a duty to disclose known errors in cost reports:

> "Whoever. . .having knowledge of the occurrence of any event affecting (A) his initial or continued right to any such benefit or payment. . .conceals or fails to disclose such event with an intent fraudulently to secure such benefit or payment either in a greater amount or quantity than is due or when no such benefit or payment is authorized. . .shall in the case of such a. . .concealment or failure. . .be guilty of a felony."

39.     Defendants submitted cost reports at all times material to this Complaint. Defendants caused the cost reports to be submitted and signed in different years by Mr. Ben McKibbens, Mr. Billy Joe Simpson, Mr. E. Wayne Lee, Mr. James G. Springfield, Mr. Randy McLelland, Mr. Robert Dunkin, Mr. William Elliff and/or Mr. Bruce Liebert who attested, among other things, to the certification quoted above.

40.     Medicaid is a joint federal-state program that provides health care benefits for certain groups, primarily the poor and disabled.   The federal involvement in Medicaid is largely limited to providing matching funds and ensuring that states comply with minimum standards in the administration of the program.

41.     The federal Medicaid statute sets forth the minimum requirements for state Medicaid programs to qualify for federal funding, which is called federal financial participation (hereinafter "FFP").  42 U.S.C. §§ 1396 *et seq.*

42.     Each state's Medicaid program must cover hospital services.   42 U.S.C. § 1396(a)(1)(A), 42 U.S.C. § 1396d(a)(1)-(2).

43.     In Texas, before January 1, 2004, provider hospitals participating in the Medicaid program submitted claims for hospital services rendered to beneficiaries to the Texas Health & Human Services Commission through the National Heritage Insurance Company.

44.     On January 1, 2004, the Texas Medicaid and Healthcare Partnership assumed administration of Medicaid claims processing and the Medicaid primary care case management services program.

### THE FRAUD SCHEME

45.     In April of 1984, Smith-Reagan & Associates, Inc. (hereinafter "Smith-Reagan") was the insurance agent of record for the Valley Baptist Health System (hereinafter "VBHS") and its wholly owned and operated subsidiary Valley Baptist Medical Center (hereinafter "VBMC").  Relator Michael N. Swetnam, Jr., as a partner in Smith-Reagan, began managing the insurance program for Defendants over the 1985 renewal cycle and handled all aspects of the account from 1985 until 2007.

46.     In 1992, the physician medical professional liability insurance markets in Texas restricted their underwriting of and increased premiums charged for South Texas physicians due to changes in the legal environment and several adverse court decisions against physicians with practices in Hidalgo and Cameron Counties, Texas.   These premium increases had a great financial impact on surgeons and less of an impact on non-surgeons.

47.     The market increases in insurance premiums caused Defendants' medical staff to challenge Defendants' administration and Board members concerning the medical staff by-law minimum limit of liability insurance requirements of $500,000 per claim/$1,000,000 aggregate for physician medical professional liability insurance.

48.     In fact, several of the larger physician groups threatened to move their patients to different hospitals that required lower physician medical professional liability insurance limits of liability than the $500,000 per claim/$1,000,000 aggregate limits of liability required by Defendants.

49.     At the time, the other area hospitals required the physicians on their medical staffs to maintain physician professional liability insurance of just $100,000 per claim/$300,000 aggregate limits of liability or in some cases, $200,000 per claim/$600,000 aggregate.   For example, at the time, Dolly Vinsant Memorial Hospital in San Benito, Texas only required its medical staff physicians to maintain physician professional liability insurance with limits of liability of $100,000 per claim/$300,000 aggregate.

50.     Given the threats it was facing, in 1993, Defendants' administration gave Smith-Reagan a mandate to find a solution for their physicians medical staff's insurance "problem" that (1) allowed Defendants to keep their current medical staff by-law insurance requirement for physician medical professional liability insurance minimum limit of liability at $500,000/$1,000,000 while (2) costing less than the current medical professional liability insurance premiums that were offered in the market at that time.

51.     In response, in 1993, Smith-Reagan wrote a manuscript physicians excess of loss professional liability insurance policy that was designed to be similar to a risk purchasing group insurance policy format.

52.     In particular, this manuscript policy provided each attending, associate attending and provisional associate attending member of VBMC who agreed to staff the emergency room on an "on call" basis and opted to participate in the VBMC Physician Excess of Loss Self-Insurance Plan with $300,000 of coverage for any one physician claim, $900,000 aggregate any one physician for all claims and $9,000,000 aggregate all physician claims.

53.     Smith-Reagan through Relator Michael N. Swetnam, Jr. then structured stop loss reinsurance for this manuscript insurance policy which would reimburse the VBMC physician excess of loss self-insurance plan trust fund for paid claims that exceeded the stop loss reinsurance policy's claim retention of $300,000 any one physician claim; $900,000 aggregate any one physician for all claims and subject to a stop loss reinsurance policy aggregate of $9,000,000 aggregate all physician claims.  The stop loss reinsurance coverage was subject to a self-insured retention of $300,000 any one physician claim and $900,000 aggregate all claims. This excess of loss stop loss reinsurance policy would reimburse the VBMC Physicians Excess of Loss Professional Liability Self-Insurance Trust Fund and would not pay the physicians' claims directly.

54.     In 1993, Defendants' Board including Mr. Ben McKibbens, Mr. Billy Joe Simpson, Mr. Robert Dunkin and Mr. Randy McLelland reviewed Smith-Reagan's proposal and approved the purchase of the professional liability insurance policy and stop loss reinsurance policy as well as the creation of the VBMS Excess of Loss Self-Insurance Trust.

55.     A true and correct copy of the VBMC Excess of Loss Self-Insurance Trust Agreement executed by Mr. Ben M. McKibbens as President and CEO of VBMC is attached hereto as Exhibit "A".

56.     A true and correct unsigned copy of the VBMC Excess of Loss Self-Insurance Plan effective September 1, 1993 is attached hereto as Exhibit "B".

57.     From 1993 until 1996, VBMC's physician excess of loss self-insurance program was implemented and operated with great financial success and little to no comment or criticism.

58.     Then, in 1996, Smith-Reagan became aware of the federal "Stark" legislation and became concerned about the physician excess of loss self-insurance program because (1) Defendants were not charging any premiums to the participating physicians for providing the excess of loss insurance coverage through the self-insurance plan; and (2) Defendants had restricted the physician excess of loss insurance coverage to only apply to claims that arose from the physician's medical practice at either the physician's private facility or the VBMC facility. In other words, if the physician had primary insurance limits of liability of $200,000 per claim/$600,000 aggregate and participated in the VBHS Excess of Loss Self-Insurance Plan, the physician had an increased, no-cost combined limit of liability of $500,000 per claim/$1,500,000 aggregate for patients that the physician treated at the VBMC facility or his/her office.  On the other hand, if the physician chose to treat patients at other hospital facilities, then the physician would have professional liability coverage of only $200,000 per claim/$600,000 aggregate and the VBMC excess of loss self-insurance plan coverage would not apply to claims that arose at other hospitals.

59.     In 1998, attorney Patsy Nichols of the law firm of Fulbright Jaworski sent a letter to Defendants advising the administration that it was the firm's legal opinion that the VBMC Physician Excess of Loss Self-Insurance Plan and Self-Insurance Trust should be discontinued immediately and the program should be dismantled as quickly as possible because of its violation of Stark and the possible adverse effect it could have on Defendants' Medicare funding.

60.     In response, Defendants' administration chose to disregard the Fulbright Jaworski recommendation and instead, continued the administration of the VBMC Physician Excess of Loss Self-Insurance Plan and Self-Insurance Trust.

61.     Defendants' decision to continue with the VBMC Physician Excess of Loss Self-Insurance Plan and Self-Insurance Trust came down to simple dollars and cents. Over the life of the VBMC Physician Excess of Loss Self-Insurance Plan and Self-Insurance Trust, funding only cost Defendants a total of $7,828,642 in total insurance premiums and claim payouts. However, by providing the plan, Defendants secured close to 100% of the local medical community's Medicare and Medicaid patient services and patient hospital services. A true and correct of Relator Michael N. Swetnam, Jr.'s 1998 list of over 300 physicians participating in the VBMC Physician Excess of Loss Self-Insurance Plan is attached hereto as Exhibit "C".

62.     From 1998 to 2004, Defendants continued to offer and operate the VBMC Physician Excess of Loss Self-Insurance Plan and Self-Insurance Trust. A true and correct unsigned copy of the VBMC Excess of Loss Self-Insurance Plan effective September 1, 2000 is attached hereto as Exhibit "D".

63.     During that time, Relator Michael N. Swetnam, Jr. repeatedly cautioned Defendants, Defendants' Board, management and individual Board members that the program had been deemed to be in violation of federal law and as a result, in his opinion, should be dismantled.

64.     Finally, in July, 2004, and only after repeated warnings, admonitions and the continued threat of serious repercussions, Defendants terminated the program.

65.     In 2003 and 2004, VBHS's total annual net patient service revenue was approximately $270,000,000 and $300,000,000 respectively.

66.     For 2003, 34% of VBHS's patient revenue was subject to Medicare reimbursement and 9% was subject to Medicaid reimbursement. In 2004, 36% of VBHS's patient revenue was subject to Medicare reimbursement and 7% was subject to Medicaid reimbursement.

67.     By conservative estimate, over the course of the last ten (10) years of Defendants' Excess of Loss program, Defendants received approximately $1,161,000,000 of Medicare and Medicaid payments for referrals from physicians participating in Defendants' Physician Excess of Loss Self-Insurance Plan and Self-Insurance Trust.

## FALSE AND FRAUDULENT CLAIMS AND STATEMENTS

68.     The physicians to whom Defendants provided illegal remuneration and kickbacks and with whom Defendants entered into illegal financial relationships referred large volumes of patients, including Medicare and Medicaid patients, to Defendants in violation of federal law. Defendants, in turn, submitted claims to Medicare and Medicaid and obtained billions of dollars worth of payments from the United States. Under the False Claims Act, 31 U.S.C. § 3729(a)(1), such claims were false and/or fraudulent because Defendants had no entitlement to payment for services provided on referrals from such physicians.

69.     Defendants also violated the False Claims Act, 31 U.S.C. § 3729(a)(2), by making or causing to be made false statements when submitting these claims for payment to Medicare and other government programs. Defendants falsely certified the claims and statements were "true" and/or "correct" and as such were entitled to payment.

70.     To conceal its unlawful conduct and avoid refunding payments made on the false claims, Defendants also falsely certified, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(7), that the services identified in the annual cost reports were provided in compliance

with federal law, including the prohibitions against kickbacks, illegal remuneration to physicians, and improper financial relationships with physicians.  The false certifications, made with each annual cost report submitted to the government, were part of Defendants' unlawful scheme to defraud Medicare and other government healthcare programs.

71.    Defendants submitted and caused to be submitted false claims to Medicare and Medicaid for payment including:

> a.    submitting claims for Medicare payment in violation of Stark II, 42 U.S.C. § 1395nn(a)(2); and
>
> b.    falsely representing and causing others to falsely represent that the various medical services provided to patients were medically necessary.

72.    Defendants submitted, and caused to be submitted false cost reports to Medicare for the years 1993 through 2004 with supporting documents and certifications in order to obtain payments from Medicare knowing that those documents included false representations including: the cost reports for 1993 through 2004 each included a certification falsely representing that services provided by the hospital were provided in compliance with pertinent laws and regulations when in fact, Defendants knew that they had violated various laws and regulations, including those pertaining to kickbacks, providing medically necessary services and the establishment of an illegal insurance program.

## AMOUNT OF MEDICARE AND MEDICAID PAYMENTS

73.    As a result of Defendants' false and fraudulent claims for reimbursement, Medicare reimbursed Defendants at least $945,000,000 in Medicare monies during the period 1993 through 2004; and $216,000,000 in Medicaid monies during the period 1993 through 2004.

74.    In so doing, Defendants presented, or caused to be presented, these claims with actual knowledge or their falsity, or in deliberate ignorance or reckless disregard that such claims were false and fraudulent.

### COUNT I
### FALSE CLAIMS ACT, 31 U.S.C. § 3729(a)(1)
### PRESENTING CLAIMS TO MEDICARE AND MEDICAID
### FOR SERVICES RENDERED AS A RESULT OF KICKBACKS

75.    Plaintiff incorporates by reference paragraphs 1 through 74 of this Complaint as if fully set forth.

76.    Defendants knowingly presented, or caused to be presented, false and fraudulent claims for payment or approval to the United Sates, including claims for reimbursement for services rendered to patients unlawfully referred to Defendants' facilities by physicians and others to whom Defendants provided kickbacks and/or illegal remuneration and/or with whom Defendants entered into prohibited financial relationships in violation of the Anti-Kickback Statute and the Stark Statute.

77.    By virtue of the false or fraudulent claims by Defendants, the United States suffered damages and therefore is entitled to multiple damages under the False Claims Act, to be determined at trial, plus a civil penalty of $5,000 to $10,000 for each violation.

### COUNT II
### FALSE CLAIMS ACT, 31 U.S.C. § 3729(a)(2)
### USE OF FALSE STATEMENTS

78.    Plaintiff incorporates by reference paragraphs 1 through 74 of this Complaint as if fully set forth.

79.    Defendants knowingly made, used, and caused to be made or used, false records or statements – *i.e.*, the false certifications and representations made and caused to be made by Defendants when initially submitting the false claims for interim payments and the false

certifications made and caused to be made by Defendants in submitting the cost reports — to get false or fraudulent claims paid and approved by the United States.

80.    By virtue of the false and fraudulent claims made by Defendants, the United States suffered damages and therefore is entitled to multiple damages under the False Claims Act, to be determined at trial, plus a civil penalty of $5,000 to $10,000 for each violation.

**COUNT III**
**FALSE CLAIMS ACT, 31 U.S.C. § 3729(a)(3)**
**CONSPIRACY TO SUBMIT FALSE CLAIMS**

81.    Plaintiff incorporates by reference paragraphs 1 through 74 of this Complaint as if fully set forth.

82.    Defendants entered into agreements with certain physicians and conspired to defraud the United States by submitting false and fraudulent claims for reimbursement from the United States for monies to which they were not entitled, in violation of 31 U.S.C. § 3729(a)(3). As part of the schemes and agreements to obtain reimbursement from the United States in violation of federal laws, Defendants conspired to provide kickbacks and illegal remuneration to physicians and others, to engage in prohibited financial relationships with physicians and others in violation of the Anti-Kickback Statute and the Stark Statute, and to cause the United States to pay claims for healthcare services based on false claims and false statements that the services were provided in compliance with all laws regarding the provision of healthcare services whereas they were not so provided.

83.    By virtue of Defendants' conspiracy to defraud the United States, the United States suffered damages and therefore is entitled to treble damages under the False Claims Act, plus a civil penalty of $5,000 to $10,000 for each violation.

## COUNT IV
## FALSE CLAIMS ACT, 31 U.S.C. § 3729(a)(7)
## FALSE RECORD TO AVOID AN OBLIGATION TO REFUND

84.     Plaintiff incorporates herein by reference paragraphs 1 through 74 of this Complaint as if fully set forth.

85.     Defendants knowingly made and used or caused to be made or used false records or false statements — *i.e.*, the false certification made or caused to be made by Defendants in submitting the cost reports — to conceal, avoid, or decrease an obligation to pay or transmit money or property to the United States.

86.     By virtue of the false records or false statements made by Defendants, the United States suffered damages and therefore is entitled to treble damages under the False Claims Act, to be determined at trial, plus a civil penalty of $5,000 to $10,000 for each violation.

## COUNT V
## PAYMENT UNDER MISTAKE OF FACT

87.     Plaintiff incorporates by reference paragraphs 1 through 74 of this Complaint as if fully set forth.

88.     This is a claim for the recovery of monies paid by the United States to Defendants as a result of mistaken understandings of fact.

89.     The false claims which Defendants submitted to the United States' agents were paid by the United States based upon mistaken or erroneous understandings of material fact.

90.     The United States, acting in reasonable reliance on the truthfulness of the claims and the truthfulness of Defendants' certifications and representations, paid Defendants certain sums of money to which they were not entitled, and Defendants are thus liable to account and pay such amounts, which are to be determined at trial, to the United States.

## COUNT VI
## COMMON LAW FRAUD

91.     Plaintiff incorporates by reference paragraphs 1 through 74 of this Complaint as if fully set forth.

92.     Defendants made material and false representations in their cost reports with knowledge of their falsity or reckless disregard for their truth, with the intention that the United States act upon the misrepresentations to its detriment.  The United States acted in justifiable reliance upon Defendants' misrepresentations by making interim payments on the false claims and then by settling the cost reports at inflated amounts.

93.     Had the true facts been known to the United States, Defendants would not have received the interim payments or the inflated amounts on the cost reports.

94.     By reason of these interim payments and cost reports, the United States has been damaged in an amount to be determined at trial.

## COUNT VII
## UNJUST ENRICHMENT

95.     Plaintiff incorporates by reference paragraphs 1 through 74 of this Complaint as if fully set forth.

96.     This is a claim for the recovery of monies by which Defendants have been unjustly enriched.

97.     By directly or indirectly obtaining government funds to which they were not entitled, Defendants were unjustly enriched, and are liable to account and pay such amounts, or the proceeds therefrom, which are to be determined at trial, to the United States.

## COUNT VIII
## DISGORGEMENT, CONSTRUCTIVE TRUST, AND ACCOUNTING

98.     Plaintiff incorporates by reference paragraphs 1 through 74 of this Complaint as if fully set forth.

91.     This is a claim for disgorgement of profits earned by Defendants because of illegal kickbacks Defendants paid to physicians.

92.     Defendants concealed their illegal activity through false statements, claims, and records, and failed to abide by their duty to disclose such information to the United States.

93.     The United States did not detect Defendants' illegal conduct.

94.     This Court has the equitable power to, among other things, order Defendants to disgorge the entire profit Defendants earned from business generated as a result of their violations of the Anti-Kickback Statute, the Stark Statute and the False Claims Act.

95.     By this claim, the United States requests a full accounting of all revenues (and interest thereon) and costs incurred by Defendants on referrals from physicians to whom they paid kickbacks, disgorgement of all profits earned and/or imposition of a constructive trust in favor of the United States on those profits.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff United States of America requests that judgment be entered in its favor and against Defendants Valley Baptist Health System and Valley Baptist Medical Center as follows:

1.     On the First, Second, Third and Fourth Counts under the False Claims Act for the amount of the United States' damages, trebled as required by law, and such civil penalties as are required by law, together with all such further relief as may be just and proper.

2.      On the Fifth and Seventh Counts, for payment by mistake and unjust enrichment, for the damages sustained and/or amounts by which Defendants were unjustly enriched or by which Defendants retained illegally obtained monies, plus interest, costs, and expenses, and all such further relief as may be just and proper.

3.      On the Sixth Count, for common law fraud, for compensatory and punitive damages in an amount to be determined, together with costs and interest, and for all such further relief as may be just and proper.

4.      On the Eighth Count, for disgorgement of illegal profits, for an accounting of all revenues unlawfully obtained by Defendants, the imposition of a constructive trust upon such revenues, and the disgorgement of the illegal profits obtained by Defendants and such further equitable relief as may be just and proper.

Respectfully submitted,

**CHAVES, RESENDEZ & RIVERO, L.L.P.**
Frost Bank Plaza
802 N. Carancahua, Suite 2100
Corpus Christi, Texas  78470
(361) 884-5400
(361) 884-5401 Facsimile


By: _____
         Joel C. Resendez
         State Bar No.: 16789200
         Southern Bar District ID No. 8188

**ATTORNEYS   FOR   PLAINTIFF   UNITED
STATES OF AMERICA, EX REL. MICHAEL N.
SWETNAM, JR.**