IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
ENTERED

AUG 0 6 2012

David J. Bradley, Clerk of Court

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, EX REL. MICHAEL N. SWETNAM, JR., | § § § § § § § § § § § § § § | |
| Plaintiff, | | |
| v. | | Civil Action No. B-08-446 |
| VALLEY BAPTIST HEALTH SYSTEM AND VALLEY BAPTIST MEDICAL CENTER | | |
| Defendants. | | |

## MEMORANDUM OPINION AND ORDER

Pending before this Court is Defendants' Motion for Summary Judgment Regarding Stark and Anti-Kickback Statute (Doc. No. 37) and Defendants' Motion for Summary Judgment Regarding the False Claims Act (Doc. No. 38). After considering the motions, all responses thereto, the summary judgment evidence presented, and the applicable law, the Court finds that Defendants' Motion for Summary Judgment Regarding Stark and Anti-Kickback Statute should be **GRANTED in part and DENIED in part**. Defendants' Motion for Summary Judgment Regarding the False Claims Act should be **GRANTED in part and DENIED in part**.

1

## I. INTRODUCTION

Michael Swetnam ("Swetnam" or "Relator") brought this *qui tam* action under the False Claims Act ("FCA"), 31 U.S.C. §§ 3729–33, alleging that Defendants' Excess of Loss ("XOL") Program violated certain federal laws.[1] Relator alleges that Defendants, Valley Baptist Medical Center and Valley Baptist Health System, submitted false claims to the government in order to receive Medicare and Medicaid reimbursements. Valley Baptist Medical Center ("VBMC") is a wholly owned and controlled subsidiary of Valley Baptist Health System ("VBHS"), which is an integrated healthcare delivery system incorporated in 2000.

## II. BACKGROUND

This case stems out of a trust agreement created in 1993 by Valley Baptist Medical Center. Defendants claim that they created the Trust in order to protect themselves from the then-mounting liability risks associated with running a hospital. Prior to that time, there had been a number of large judgments against other hospitals in Texas based upon the acts or omissions of independent practicing physicians and medical staff members. Defendants felt measures needed to be taken in order to protect the hospital from potential liability risks. While the parties dispute who was ultimately responsible for the figure, it is agreed that Defendants' trustees adopted a minimum malpractice insurance requirement for staff physicians of $500,000/$1,000,000 in 1988. At the time, physicians in Texas were not required by law to carry any malpractice insurance. This created a situation where medical staff at VBMC did not want or could

---

[1] The False Claims Act allows a private individual, a *qui tam* "relator," to "bring a civil action for a violation of Section 3729 for the person and for the United States government . . . in the name of the Government." 31 U.S.C. § 3730(b)(1) (2008).

2

not afford insurance with the new limits. Consequently, Defendants were at risk of losing their physicians.

In response to this predicament, Defendants sought a way to self-insure, enabling them to maintain the required levels of insurance as well as retain medical staff. After exploring multiple options, Defendants implemented the Excess of Loss Program and a Self-Insurance Trust Fund ("Trust"). Pursuant to this program, physicians were required to carry primary professional liability coverage with a minimum limit of $200,000/$600,000. If they obtained these minimum limits, the physicians were to receive, at no cost to the physician, an additional layer of professional liability coverage provided by the XOL Program. This meant that if a settlement or judgment were greater than the physician's primary professional liability coverage, the XOL Program would cover the judgment or settlement up to an additional $300,000/$900,000 with funds from the Trust. It also meant that the physicians saved money on insurance premiums. The XOL Program additionally required the participating physicians to agree to participate in the medical center's quality assurance programs, staff the emergency room on an "on call" basis, and complete their patients' hospital records within 30 days of each patient's discharge from the medical center.

The XOL Program was in place from 1993 to either 2003 or 2004.[2]  While the parties disagree on the extent of Relator's involvement in creating and administering this program, it is without question that he was significantly involved with the program throughout its existence. In 2008, Defendants sued Relator in Cameron County District Court alleging that he defrauded Defendants out of nearly four million dollars by selling

---

[2] Defendants claim the program was terminated in 2003 whereas Relator avers that it was terminated in 2004.

them fake insurance policies and policies with inflated premiums. Afterwards, the Texas Department of Insurance ("TDI") and the Department of Justice ("DOJ") began investigating Relator based on these allegations. Based on this investigation, Relator was eventually found guilty of three counts of mail fraud in the United States District Court for the Southern District of Texas. He was sentenced to thirty-seven months in federal prison.

In October 2008, Relator brought this *qui tam* action against Defendants claiming the XOL Program violated the False Claims Act, the Stark Law, and the Anti-Kickback Statute.

### III. LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The movant bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact." *Triple Tee Golf, Inc. v. Nike, Inc.*, 485 F.3d 253, 261 (5th Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–25 (1986)). Once a movant makes a properly supported motion, the burden shifts to the non-movant to show that summary judgment should not be granted. *Celotex*, 477 U.S. at 321–25. The nonmoving party must go beyond the pleadings and provide specific facts showing that there is a genuine issue for trial. *Celotex*, 477 U.S. at 324; *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). A dispute about a material fact is genuine if "the evidence is such

that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The Court views all evidence in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Id.* "[T]he court should give credence to the evidence favoring the nonmovant as well as that 'evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses.'" *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000). The Court may not make credibility determinations or weigh the evidence. *Harvill v. Westward Communications, L.L.C.*, 433 F.3d 428, 436 (5th Cir. 2005).

## IV. ANALYSIS

Defendants have moved for summary judgment on three separate statutes: the Stark Law ("Stark"), the Anti-Kickback Statute ("AKS"), and the False Claims Act ("FCA"). The violations of Stark and the AKS are not pleaded as separate causes of action, but instead are pleaded as predicate offenses whose violations trigger the FCA.

### 1. The Stark Law

The Stark Law prohibits physicians from referring patients to a medical facility in which the physicians have a financial interest. 42 U.S.C. § 1395nn. Relator has alleged that Defendants had a direct financial relationship with physicians wherein they provided liability coverage to physicians in order to induce referrals to their hospital. Defendants are moving for summary judgment on the Stark Law, asserting that Relator has produced no evidence to show that there was a direct or indirect financial arrangement between VBMC and physicians participating in the XOL Program. In his Response, Relator does

not contest Defendants' argument that no indirect arrangement existed—and in fact has concluded as much in oral argument; therefore, the only relevant determination the Court must make with regard to Stark is whether a direct financial relationship existed between Defendants and the physicians participating in the XOL Trust.

### A.  Direct Financial Relationship

The Stark Law prohibits a physician who has a direct or indirect financial relationship with an *entity* from referring a patient to that entity for the furnishing of Designated Health Services ("DHS") for which payment otherwise may be made under Medicare. *See* 42 U.S.C. § 1395nn. Defendants argue that the literal language of the Stark Law shows that there is no direct financial relationship between Defendants and physicians participating in the XOL Program. In support of this contention, Defendants cite the following provision of the statute:

> A direct compensation arrangement exists if remuneration passes between the referring physician (or a member of his or her immediate family) and the entity furnishing DHS without any intervening persons or entities.

42 C.F.R. § 411.354(c)(1)(i) (2011).

Defendants claim that no direct financial relationship exists because there is an intervening entity, i.e., the XOL Self-Insurance Trust, which precludes the possibility of a direct financial relationship as defined by Stark Law. When an intervening person or entity exists between the DHS entity and physician, the relationship becomes a *potentially* indirect compensation arrangement. For an indirect financial arrangement relationship to implicate Stark the compensation would have to vary with the volume of referrals. Since that is not the situation with the XOL Program, and Relator does not

6

argue that an indirect compensation arrangement exists, the Court must only determine whether the Trust constitutes an intervening entity.

The XOL Program operated in such a way that participating physicians received extra liability coverage when they attended patients within VBMC's facilities and their private offices, but not when they worked in another hospital. The accusation is that this program incentivized them to work exclusively within Defendants' facilities, thereby bringing more patients to Defendants. The physicians did not receive the insurance coverage through Defendants, but rather through the XOL Program. Defendants established a separate trust in 1993 to handle the XOL Program's claims. Therefore, if a physician ever received money to cover a claim against him it would be paid out of the Trust rather than the Defendants' coffers. Hence, the financial arrangement would be between physicians and the XOL Trust, not physicians and Defendants.

Relator disagrees that this arrangement comports with Stark. He claims that the Self-Insurance Trust is not really a separate entity as defined by Stark regulations. In the alternative, Relator argues that, even if the Trust is technically an intervening entity, it is an alter-ego of VBMC, and therefore should not be considered an intervening entity for Stark purposes.

Relator focuses on the statutory language to show that, for purposes of the Stark Law, the Self-Insurance Trust was not an entity because it did not furnish DHS. The statutory definition of "entity" in the Stark regulations reads: "any person, sole proprietorship, public or private agency or trust, corporation, partnership, limited liability company, foundation, nonprofit corporation, or unincorporated association *that furnishes DHS*." 42 C.F.R. § 411.351 (emphasis added).  Relator argues that because the XOL

7

Trust did not furnish DHS it is not an "entity" as defined by Stark. If it is not an entity, it cannot possibly be an "intervening entity" that severs a direct relationship.

Defendants respond to this line of reasoning by contending that, throughout the statute, "entity" is used in both the generic sense of the word and as the term of art defined above. They further postulate that Relator's conclusion comes from a misunderstanding of the Stark Law. In their Reply, Defendants assert that "nowhere in the text or preambles of its rules does [Center for Medicare and Medicaid Services ("CMS")] say that an intervening entity must be a DHS entity." To support this statement, they submitted two sworn declarations from Kevin McAnaney, the principal author of the Stark Law. In his second declaration, McAnaney states, "In my opinion and based on my experience, the existence of any person or entity between the DHS entity and the referring physician precludes a direct compensation arrangement between the referring physician and the DHS entity." (Doc. No. 47-7). He goes on to aver "Relator's reading of the regulatory definition of direct compensation arrangement at 42 C.F.R. § 411.354(b)(1)(i) incorrectly assumes that 'entity' within that definition has the same meaning as the definition of 'entity' in 42 C.F.R. § 411.351. However, the prefatory language of § 411.351 expressly states that the definitions do not apply if 'the context indicates otherwise.'"[3] McAnaney's declaration continues by detailing how the context of this particular use of 'entity,' a logical interpretation of the statute and the legislative history *do* indicate otherwise.

Neither party cites to case law on this subject, and the Court was unable to locate any directly applicable decisions during its own research, thus the issue comes down to

---

[3] McAnaney's declarations were not the subject of any objections, despite the fact that many of his statements perhaps invade the realm of legal conclusions rather than factual declarations. The Court, however, relies only upon the properly admissible portions of the declarations.

statutory interpretation. The Court is persuaded by the fact that "entity" is used both in its generic sense and in its term-of-art sense throughout the statute (e.g. in defining entity, the statute uses the generic term to define it by saying "a person or entity is considered to be furnishing DHS…"). Therefore, this Court finds that the Trust is an intervening entity for purposes of the Stark Law.[4]

### B. Alter-Ego

In addition to his response that the Trust is not an intervening entity for Stark purposes, Relator also proposes that the Trust is not an intervening entity because it is merely an alter-ego of VBMC. Defendants respond to this allegation in two ways: (1) the XOL Trust is not an alter-ego but a separate and distinct entity, and (2) the Stark statute does not have a "stand-in-the-shoes" policy (whereby the Trust entity would be ignored) for anything but physician organizations.

### i. Is XOL Trust a Separate and Distinct Entity?

Relator asks the Court to recognize that, in the Fifth Circuit, federal common law governs alter-ego analysis in cases involving Medicare fraud. While this assertion is not entirely accurate, Relator is generally correct that the Fifth Circuit has tended to opt for federal common law when analyzing alter-ego cases involving fraud against the government. *See United States v. Jon-T Chemicals*, 768 F.2d 686, 690 (5th Cir. 1985)

---

[4] At a hearing on the motions on May 3, 2012, the Court raised the additional issue of whether a trust is a legal entity at all, not simply for the purposes of Stark. While the law under the Fifth Circuit is unsettled with regard to whether a trust is a legal entity, the Court is satisfied that the case law at least allows for the possibility that a trust can be a legal entity in particular contexts. *See, e.g., Stiftung v. Plains Marketing*, 603 F.3d 295, 298 (5th Cir. 2010); *North Texas Specialty Physicians v. F.T.C.*, 528 F.3d 346, 356 (5th Cir. 2008); *Legal Security Life Insurance Company v. United States*, 302 F.2d 315, 318 (5th Cir. 1962). *But see Bonner v. Henderson*, 147 F.3d 457, 459 (5th Cir. 1998). Noting this, as well as the fact that the language in Stark seems to contemplate a trust as a legal entity, the Court determines that, for purposes of Stark, a trust can be a legal entity.

(finding no need to hold definitively for a uniform federal alter-ego standard, but utilizing federal law). A recent Northern District of Texas case put it more accurately, noting: "Although not yet addressed by the Fifth Circuit, other circuits have held that federal common law (rather than the law of the state), governs the veil-piercing question in a FCA case." *United States ex rel. Dekort v. Integrated Coast Guard Sys.*, 705 F.Supp.2d 519 (N.D.Tex. 2010). While an alter-ego analysis is universally acknowledged as a murky area of the law, the Fifth Circuit basically asks whether the parent corporation (or entity) totally dominated the subservient entity to the extent that the subservient entity essentially has no identity of its own. *See generally Jon-T Chemicals*, 768 F.2d at 691–92; *Krivo Industrial Supply Co. v. National Distillers*, 483 F.2d 1098, 1102 (5th Cir. 1973). The Fifth Circuit has developed a list of factors to consider when determining whether an alter-ego situation exists: (1) common stock ownership; (2) common directors or officers; (3) common business departments; (4) consolidated financial statements and tax returns; (5) one corporation finances the other; (6) one corporation caused the incorporation of the other; (7) one corporation operates with grossly inadequate capital; (8) one corporation pays the salaries and other expenses of the other; (9) one corporation receives no business except that given to it by the other; (10) one corporation uses the other's property as its own; (11) the daily operations of the two corporations are not kept separate; (12) one corporation does not observe the basic corporate formalities, such as keeping separate books and records and holding shareholder and board meetings. *See, e.g., Gundle Lining Construction v. Adams Co. Asphalt Inc.*, 85 F.3d 201, 208 (5th Cir. 1996); *Dekort*, 705 F.Supp.2d at 546. The Fifth Circuit has also noted there is no litmus

test for determining whether a subsidiary is the alter-ego of its parent. Rather the resolution of the issue is heavily fact specific. *Jon-T Chemical*, 768 F.2d at 694.

Relator leans almost entirely on the Swetnam Declaration (Doc. No. 54) for his evidence that the XOL Trust was merely an alter-ego of VBMC. Relator attempts to present evidence stating that the Trust was simply a checking account of VBMC, as well as similar accusations. This Court, in a separate order, sustained various objections to these conclusory statements. That being said, Swetnam's declaration does contain admissible evidence that is germane to the alter-ego analysis. Specifically, Relator focuses on factors 2, 5, 6, 8, and 9. Factor 2 states that the two entities have common directors or officers. It is undisputed that VBMC "created" the Trust, but there is dispute regarding the identity of the trustee. Defendants claim that there was a formal conveyance of property to an independent trustee, NationsBank of Texas, whereas Relator contends Defendants appointed the trustees of the Trust. He claims they appointed "employees, Board Members, or other agents and affiliates of Valley Baptist medical system and family of companies to serve as Trustees." (Doc. No. 54 at ¶4). Further, he claims that the Trustee had no real control as Ben McKibbens (Defendants' CEO) and Billy Joe Simpson (Defendants' Chairman of the Board) controlled the fund and had to approve any payment out of the fund. *Id.* at ¶15. Also, Relator claims that Defendants, the XOL Program, and the Trust all shared the same Trustees/Directors, managers, officers, investment office, and bank. *Id.* at ¶21.

Factor 5, the funding of the subsidiary by the parent, is implicated here, according to Relator, because the Trust received all money from VBMC. *Id.* at ¶16. Factor 6, that one entity caused the creation of the other, is obviously true here as VBMC clearly

11

started the Trust. *Id.*; (Doc. No. 44-3). Factor 8, that one entity pays the salaries and expenses of the other, is applicable here as Relator states as much, albeit succinctly, in his declaration. (Doc. 54 at ¶4). Finally, Factor 9, one entity only receives business given to it by the other, is undisputable here, as the Trust was set up for the hospital and is directly connected to its business. That much is explicit in the Trust Agreement. (Doc. 44-3).

Since Relator has raised five factors that potentially indicate an alter-ego relationship, and has backed the allegations with evidence, the question would normally survive summary judgment and go to a fact finder. *See, e.g., Jon-T Chemicals,* 768 F.2d at 695–96 (holding it is for the factfinder to weigh the evidence and to determine whether an alter-ego existed); *United States v. Viking Resource, Inc.,* 607 F.Supp.2d 808, 824 (S.D.Tex. 2009) ("The [nonmovant] has presented sufficient evidence to raise genuine fact issues as to the relevant factors that must be considered in deciding whether Viking's corporate veil should be pierced as to [the subsidiary]. Therefore . . . summary judgment for [the subsidiary] is not appropriate."). It is not in the province of this Court at this stage to weigh the evidence, and it seems possible that a reasonable finder of fact could find these factors to be sufficient to determine an alter-ego existed. However, further consideration is warranted due to the "stand-in-the-shoes" policy.

ii. Stand-in-the-Shoes Policy

The above analysis leads one to the conclusion that the jury should resolve this issue; however, that assumes that if an entity is an alter-ego it cannot be an intervening entity for purposes of Stark. Otherwise the issue is irrelevant. Defendants assert that a direct relationship does not exist where there is *any* intervening entity, even one that is

12

solely owned or controlled by the DHS entity. They point out that such sweeping language in the statute necessitated CMS to adopt a subsequent "stand-in-the-shoes" policy. This policy treats a physician owner of a "physician organization"[5] as if he/she were standing in the shoes of the organization. That is, a physician could not simply place his/her organization between himself/herself and the DHS entity to avoid Stark consequences. This policy was first adopted in September of 2007. However, the policy's only limitation was on physician-owned organizations; it did not include other types of entities. In 2009, CMS proposed a DHS entity "stand-in-the-shoes" provision whereby "an entity that furnishes DHS would be deemed to stand in the shoes of an organization in which it has 100 percent ownership and would be deemed to have the same compensation arrangements with the same parties and on the same terms as does the organization that it owns." 73 Fed. Reg. 23528, 23629 (Apr. 30, 2008). CMS never adopted this proposal, nor another similar proposal made in 2007. The only thing that makes a direct compensation arrangement illegal is the Stark Law. It was a legislative decision to forbid this type of arrangement. Therefore, in the absence of regulations prohibiting an organization from utilizing a wholly-owned entity to act as an intervening entity, this Court will not presume such rules exist. Further, when CMS had the opportunity to enact this type of regulation, it twice chose not to.[6] Defendants emphasize that this means the *only* situation in which the stand-in-the-shoes policy applies is one

---

[5] Physician organization is defined as a "physician, a physician practice, or a group practice that complies with the requirements of 42 C.F.R. § 411.352."

[6] This Court will not presume to enact a statute or regulation prohibiting certain activity where both the Legislative and Executive branches of the government had the opportunity to do so and both refused. This is especially true in an arena where a violation of this unwritten law could lead to monetary penalties and unexpected civil liability.

where the "intervening entity" is a physician organization in which the physician has an ownership or investment interest in.

In *United States v. Bradford Regional Medical Center*, the district court held that the policy applied to the facts of that particular case, which was also in the FCA context. 752 F.Supp.2d 602, 618–19 (W.D.Pa. 2010). The facts of that case involved a physician organization. The court held that the stand-in-the-shoes policy effectively ended the defendants' argument that no direct compensation arrangement existed between the physicians and the hospital. In that case, the defendants had argued that no direct compensation arrangement existed between the hospital and physicians because the money "flowed through" another entity, i.e., their physician organization. Those facts are distinguishable from the present case, and the distinction actually proves the rule here.

The *Bradford Regional* court held that the stand-in-the-shoes policy is what made the relationship direct—not the actual structure of the relationship. The court even suggested that had the stand-in-the-shoes policy not been in place, the result would likely have been different. That is, had CMS not implemented the stand-in-the-shoes policy for physician organizations, the *Bradford Regional* court would have found that there was no direct financial relationship between the physicians and the hospital because the physician organization was an intervening entity. Nevertheless, due to the stand-in-the-shoes policy, the *Bradford Regional* court was forced to treat the physician organization as if it was the physicians themselves. This is significant because, in the present case, the stand-in-the-shoes policy does not apply to the XOL Trust because it is not a physician organization. As Defendants make clear in their motion, the stand-in-the-shoes policy was proposed for other types of entities, but CMS decided not to adopt it, basically

relegating the applicability of the policy exclusively to physician organizations. Consequently, the fact that the XOL Trust exists, because it is a separate legal entity not implicated by the Stand-in-the-Shoes policy, precludes the possibility of a VBMC-physician direct financial relationship. Defendants' motion, therefore, is granted with regard to the alleged Stark violations.

## 2. Anti-Kickback Statute

The Anti-Kickback Statute ("AKS") prohibits certain types of payments or remunerations that are offered to induce referrals. Congress amended the statute in 1977 in an effort to expand the statutes reach and make enforcement more vigorous. *See United States v. Greber,* 760 F.2d 68, 70–71 (3d. Cir.1985). The purpose of the statute and the amendments was to stem fraud and abuse in the Medicare system. *Id.* The Third Circuit noted that Congress viewed elimination of kickbacks as central to any efforts to combat Medicare fraud and abuse. *Id.* The Anti-Kickback Statute states in pertinent part:

> (b) **Illegal remunerations**
>
> * * *
>
> (2) Whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person—
> (A) to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or
> (B) to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program, shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

42 U.S.C. § 1320-a7b(b).

Relator has alleged that Defendants, via the XOL Program, knowingly provided excess malpractice coverage to physicians to induce patient referrals to their hospital.

Defendants move for summary judgment on this point because they claim Relator has produced no (credible) evidence showing Defendants intended to induce referrals through the XOL Program. Defendants concede that the statute has been interpreted to apply to any arrangement where even one purpose of the remuneration offered, paid, received, etc. is to obtain money in exchange for referrals or to induce referrals. *See United States v. Davis*, 132 F.3d 1092, 1094 (5th Cir. 1998). Nevertheless, they contend the statute is one of intent, and they assert that Relator has not provided any (credible) evidence of an intention to induce referrals. Defendants note, on the other hand, that they have provided a considerable amount of evidence to show that VBMC had incentive to create the XOL Program out of self-interest that had nothing to do with inducing referrals. Simply because implementing the program caused more patients to be referred to the hospital does not mean that the purpose in starting the program was to induce more referrals.

In order to prove a violation of the AKS, a party must show that the defendant "knowingly and willfully made a payment or offer of payment as an inducement to the payee to refer an individual to another for the furnishing of an item or service that could be paid for by a federal healthcare program." *United States v. Miles,* 360 F.3d 472, 479–80 (5th Cir. 2004) (numbering omitted). In other words, Relator must show that Defendants (1) caused claims to be submitted to the government, (2) remunerated physicians with a purpose to induce referrals, and (3) knew that their actions violated the AKS. *United States ex rel. Pogue v. Diabetes Treatment Cntrs. Of Am.*, 565 F.Supp.2d 153, 160 (D.D.C. 2008). *Pogue* held that a relator may "survive summary judgment if they have produced sufficient circumstantial evidence to create a jury question as to whether a defendant violated the AKS" even if he is lacking a "smoking gun." *Id.* at 162.

16

Relator first stresses that discovery has been frozen and abated for some time in this case, and he has been unable to depose key individuals who could shed light on the intent issue. (The Court abated the discovery deadlines but not discovery. The parties certainly could have interpreted this to be an abatement of all activity. *See* Doc. No. 40.) Nevertheless, Relator submits that he has presented sufficient circumstantial evidence to survive the summary judgment motion. During the summary judgment hearing, Relator's Counsel identified four pieces of circumstantial evidence that they believe meet the summary judgment burden even without the depositions. These four pieces of evidence are all contained within the Swetnam Declaration (Doc. No. 54). In that document, Swetnam declared that: first, the XOL Program's coverage benefit was only offered with respect to patients who were admitted to Defendants' hospital (Doc. No. 54 at ¶23); second, the XOL Program was used to recruit new physicians to become members of VBMC staff, often from other valley-area hospitals. (Doc. No. 54 at ¶28); third, Medicare and Medicaid referrals increased after initiation of the XOL Program, as did physician enrollment and patient referrals. *Id.*; and fourth, VBMC's CEO Ben McKibbens stated that the XOL Program "gave [him] a stick to control physicians" and "helped medical staff recruitment and VBMC's patient referrals." *Id.* at ¶¶31–32. Relator asserts that this circumstantial evidence raises a fact issue as to Defendants' intent. He claims a reasonable jury could determine that Defendants implemented the XOL Program, at least partially, in order to induce patient referrals to their hospital. Defendants maintain that the true purpose in starting the program was to protect themselves. As cited above, however, the Fifth Circuit has held that even if there was a legitimate reason for establishing compensation, if there was also the intent to induce referrals the arrangement

17

violates the AKS. *See Davis*, 132 F.3d at 1094; *see also Pogue* at 162 (citing *United States v. Greber*, 760 F.2d 68, 72 (3rd Cir. 1985) (finding that payment to physicians violated the AKS if, in addition to compensating the physicians for legitimate duties, it was also intended to induce referrals)).

It is not the Court's duty to weigh the evidence at the summary judgment phase. While Defendants maintain that the record shows no evidence of intent, Relator has produced enough to convince this Court that there is an issue of material fact involved. Swetnam's declaration includes an (alleged) explicit admission from Defendants' CEO that the XOL Program was good because it helped with patient referrals.[7] The decision of whether Defendants actually initiated the XOL Program to induce referrals or did so solely to protect themselves should be left to the factfinder. Therefore, Relator has presented sufficient evidence to survive the summary judgment motion as to the AKS-based claims.

### 3. False Claims Act

The False Claims Act ("FCA") imposes civil liability on anyone who:

> (1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government . . . a false or fraudulent claim for payment or approval;
> (2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government;
> (3) conspires to defraud the Government by getting a false or fraudulent claim allowed or paid;

31 U.S.C. § 3729(a)(1)–(3) (2008).[8] The Fifth Circuit has noted that not all fraudulent activity involving the government is subject to FCA liability; rather, "the statute attaches

---

[7] The Court makes no findings of Relator's credibility at this stage of the litigation.
[8] It is important to note that this statute was amended in 2009. The statute now has different numbering and its language has been changed in some significant ways. Most importantly for the present litigation, §

liability, not to the underlying fraudulent activity or to the government's wrongful payment, but to the claim for payment." *United States ex rel. Longhi v. Lithium Power Tech. Inc.*, 575 F.3d 458, 467 (5th Cir.2009) (internal citations omitted). "Evidence of an actual false claim is the *'sine qua non* of a False Claims Act violation.'" *United States ex rel. Clausen v. Lab. Corp. of Am., Inc.*, 290 F.3d 1301, 1311 (11th Cir. 2002).

The FCA defines the terms "knowing" and "knowingly," which mean that a person, with respect to information:

> (1) has actual knowledge of the information;
>
> (2) acts in deliberate ignorance of the truth or falsity of the information; or
>
> (3) acts in reckless disregard of the truth or falsity of the information.

31 U.S.C. § 3729(b). In addition to the requirements found in the text, Fifth Circuit jurisprudence holds that a false or fraudulent claim or statement violates the FCA only if it is material. *See, e.g., United States ex rel. Longhi v. Lithium Power Tech. Inc.*, 575 F.3d 458 (5th Cir. 2009); *United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 902 (5th Cir. 1997) (stating that the FCA "interdicts material misrepresentations made to qualify for government privileges or services") (internal citation omitted).

In this case, Relator alleges Defendants knowingly presented false claims for reimbursement to CMS in violation of 31 U.S.C. § 3729(a)(1), that Defendants knowingly made or used false records or statements to get these false claims paid in

---

3729(a)(2), now listed as § 3729(a)(1)(B), has been altered substantively. While there exists a split among courts as to whether the amendment should apply to a case such as this, *Compare United States ex. rel. Bennett v. Boston Scientific Corp*, 2011 WL 1231577 (S.D.Tex. 2011) *with United States ex. rel. King v. Solvay, et al.*, 2011 WL 4834030 (S.D.Tex. 2011) *rev'd on other grounds*, 2012 WL 1067228 (S.D.Tex 2012), both parties submitted briefs upon request of the Court and have agreed that the amendment should not apply to this case. Therefore, the Court will continue to use the pre-amendment numbering and statutory language for the duration of this Order.

violation of 31 U.S.C. § 3729(a)(2), and that Defendants conspired to defraud the government by getting these false claims paid in violation of 31 U.S.C. § 3729(a)(3). Relator alleges that the manner in which Defendants violated these provisions of the FCA was by engaging in an illegal referral scheme that violated both the AKS and the Stark Law.[9] By violating the acts, every claim for reimbursement to CMS during the relevant time period would be violation of the FCA under the "false certification" theory of liability.

Under the false certification theory of liability, an entity is liable under the FCA for falsely certifying that it is in compliance with regulations which are prerequisites to government payment in connection with the claim for payment of federal funds. *See Rodriguez v. Our Lady of Lourdes Med. Ctr.,* 552 F.3d 297, 303 (3d Cir. 2008), *overruled in part on other grounds by United States ex rel. Eisenstein v. City of New York,* 556 U.S. 928 (2009). Thus, "where the government has conditioned payment of a claim upon a claimant's certification of compliance with, for example, a statute or regulation, a claimant submits a false or fraudulent claims when he or she falsely certifies compliance with that statute or regulation." *United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.,* 125 F.3d 899, 902 (5th Cir. 1997). Therefore, in order for the Court to determine that Defendants submitted, or caused to be submitted, a "false claim" it must first find that either the Anti–Kickback Statute or Stark Law was violated, as the cost reports submitted to the government certified compliance with federal law.[10] As the Court

---

[9] As stated previously, the AKS and Stark Law violations are only alleged in this case as bases for the FCA claims. There are no stand-alone Stark or AKS causes of action in this case.

[10] There has been much debate about whether there is an "implied certification" theory in addition to the express certification theory. As the Fifth Circuit has declined to decide the issue, this Court will follow the example of other district courts within the Circuit by declining to entertain that potential cause of action until the Fifth Circuit weighs in on the debate. *See, e.g., United States ex rel. Marcy v. Rowan Cos., Inc.,*

has decided there is an issue of material fact as to the AKS, the FCA is potentially implicated.

Relator has alleged that Defendants violated three subsections of the FCA: § 3729(a)(1), § 3729(a)(2), and § 3729(a)(3). Defendants only move for summary judgment with regard to §§ 3729(a)(2) and (a)(3)—they concede that if the Court does not dismiss the case for lack of jurisdiction, the case will proceed past the summary judgment stage on at least the § 3729(a)(1) claim. Therefore, at present, this Court must determine whether Relator has raised a fact issue as to whether Defendants knowingly made, used, or caused to be made or used, a false record or statement to get a false claim paid or approved by the Government. The Court must also determine whether Relator has raised a fact issue as to whether Defendants conspired to defraud the Government by getting a false claim allowed or paid. The Court will deal with each claim individually.

A. § 3729(a)(2) Claim

Defendants move for summary judgment on Relator's 31 U.S.C. § 3729(a)(2) claim because they claim there is no evidence that Defendants submitted false claims as a condition of payment by the Government, and Defendants never received any payments directly from the Government.

In order to establish a violation of the § 3729(a)(2), a relator must show by a preponderance of the evidence that: (1) there was a false statement or fraudulent course of conduct; (2) made or carried out with the requisite scienter; (3) that was material; and (4) that caused the Government to pay out money or to forfeit moneys due (i.e. that involved a claim). *See Longhi,* 575 F.3d at 467. Relator alleges that Defendants violated §

---

520 F.3d 384, 389 (5th Cir. 2008); *United States ex rel. Gonzalez v. Fresenius,* 748 F.Supp.2d 95, 112 (W.D.Tex. 2010) (collecting cases).

3729(a)(2) by falsely certifying they were in compliance with federal regulations on their cost reports, which were submitted to third party administrators to facilitate their Medicare and Medicaid claims. The first and second requirements concerning false statement and requisite scienter (i.e. knowingly) are met, viewing the evidence in light most favorable to the non-movant, by Relator's summary judgment evidence. That is, due to the Swetnam declaration and the Court's ruling above with regard to the AKS, there is a fact issue as to whether Defendants knew they were violating the AKS. If they knew, any certification of compliance with federal laws would be false. Whether Relator has presented sufficient evidence with regard to prongs three and four of the test, that the false statements were material and that such statements caused the Government to pay out money, are therefore contested issues this Court must decide.

### i. Materiality

The Fifth Circuit recently addressed the issue of materiality in great detail. *See Longhi,* 575 F.3d at 468–71. First it acknowledged that "No majority decision of this circuit has addressed the proper standard for assessing the materiality of a false statement under the FCA's civil-liability provisions." *Id.* at 468 (internal citation omitted). Nevertheless, all decisions of the Circuit had recognized that a false statement is material if it has a natural tendency to influence, or is capable of influencing, the decision of the decision-making body to which it was addressed. *Neder v. United States,* 527 U.S. 1, 16, (1999); *see also United States v. Southland Mgmt. Corp. (Southland II),* 326 F.3d 669, 679 (5th Cir. 2003) (en banc) (Jones, J., concurring); *United States v. Southland Mgmt. Corp. (Southland I),* 288 F.3d 665, 676 (5th Cir. 2002), *vacated by grant of reh'g en banc,* 307 F.3d 352 (5th Cir. 2002) (quoting *United States v. Wells,* 519 U.S. 482, 489

(1997)). The Fifth Circuit, however, had previously noted two different interpretations of the "natural tendency to influence or capable of influencing" standard. *Southland I,* 288 F.3d at 676. Some courts had defined the standard to require "outcome materiality" wherein "a falsehood or misrepresentations must affect the government's ultimate decision whether to remit funds to the claimant in order to be 'material.'" *Id.* (internal citations omitted). In contrast, another court required what is termed "claim materiality" in which "a falsehood or misrepresentation must be material to the defendant's claim of right in order to be considered 'material' for the purposes of the FCA." *Id.* (citing *United States ex rel. Wilkins v. N. Am. Constr. Corp.,* 173 F.Supp.2d 601, 630 (S.D.Tex.2001)). That disagreement appeared to be resolved in *Southland II* when the five concurring judges of the Fifth Circuit suggested that outcome materiality is the correct standard, explaining that a statement is material only if it actually affects the government's decision to pay. *United States ex rel. Laird v. Lockheed Martin Eng'g & Science Servs. Co.,* 491 F.3d 254, 261 (5th Cir. 2007) (citing *Southland II,* 326 F.3d at 679 n.3). In *Longhi,* the Fifth Circuit went a step further in clarifying its position by holding that "the FCA requires proof only that the defendant's false statements 'could have' influenced the government's payment decision or had the 'potential' to influence the government's decision, not that the false statements actually did so." It felt this interpretation was more in line with Congress's intent and could be unambiguously and easily applied.[11]

---

[11]    The court stated "Congress recently codified the definition of materiality when it enacted the Fraud Enforcement and Recovery Act of 2009 (FERA) . . . Congress enacted § 4 of FERA to clarify the FCA and 'to reflect the original intent of the law.' Congress's enactment will add the following language to § 3729(b): "(4) the term 'material' means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." If Congress intended materiality to be defined under the more narrow outcome materiality standard, it had ample opportunity to adopt the outcome materiality standard in FERA. Instead, Congress embraced the test as stated by the Supreme Court and several courts of appeals. While we decline to rule on whether this statute applies retroactively . . . we find this enactment to be relevant as to Congress's intent when it enacted the FCA. *See NCNB Texas Nat'l Bank*

> Thus, the "natural tendency to influence or capable of influencing" test requires only that the false or fraudulent statements either (1) make the government prone to a particular impression, thereby producing some sort of effect, or (2) have the ability to effect the government's actions, even if this is a result of indirect or intangible actions on the part of the Defendants. All that is required under the test for materiality, therefore, is that the false or fraudulent statements have the potential to influence the government's decisions.

*Longhi*, 575 F.3d at 470. This language gives the Court a clear roadmap on how to evaluate materiality.

Relator avers that Defendants potentially influenced the government's decision to reimburse their Medicare and Medicaid claims by falsely certifying compliance with federal law. Defendants claim that this certification on the cost reports was not a precondition to receiving funds from the government. It follows logically that if the certifications are a prerequisite to receiving payment from the government, then they have the potential to influence the government's decision, and therefore are material. Thus, the critical question of materiality for the present case is whether Defendants had to certify that they complied with federal law in order to receive payment from the government for their Medicare and Medicaid claims.

Defendants claim that the certifications were not prerequisites to receiving money from the government because by the time Defendants submitted the hospital cost reports, they had already received the majority of their Medicare and Medicaid reimbursements from private intermediaries. They explain that the hospital cost reports, which Relator identifies as the documents containing the false statements, are submitted to a private intermediary at the end of each year. By the time they are submitted, the intermediaries have paid the majority of the reimbursements because the Medicare and Medicaid claims

---

*v. Cowden,* 895 F.2d 1488, 1500 (5th Cir.1990) ( "[A] legislative body may amend statutory language to make what was intended all along even more unmistakably clear.")." *Longhi* at 470.

are paid "as they occur during the year." Therefore, Defendants argue, the allegedly false statements were not made "to get" payment or approval from the government.

Defendants rely very heavily on the language of *Allison Engine Co. Inc. v. U.S. ex rel. Sanders* to support their position. 553 U.S. 662 (2008). In *Allison Engine*, the Supreme Court held that a subcontractor who submitted fraudulent invoices to a general contractor in a government contract did not violate 3729(a)(2) unless he intended his statement to be material to the government's decision to pay the claim. *Allison Engine,* 553 U.S. at 671. In that case, the general contractor had already been paid by the government. In order for the subcontractor to be liable, he "must make the false record or statement 'to get' a false or fraudulent claim 'paid or approved by the government.'" *Id.* at 668. Using government funds to make the payment is not sufficient. Since the government had already given a block grant to the contractor, the subcontractor's false statement in no way influenced the government's payment of the claim.

Relator uses his Response to distinguish the present case from the facts in *Allison Engine* and to offer case law from other jurisdictions that he suggests are more comparable to this situation. He argues that *Allison Engine* has a more nuanced holding than Defendants have put forward, and that this case is easily within the parameters of § 3729(a)(2).

Relator asserts that *Allison Engine* had two primary holdings regarding § 3729(a)(2) claims: (1) that the defendant must intend that the false statement be material to the *Government's decision* to pay or approve the false claim; and (2) that the defendant must intend that the Government *itself* pay the claim. Therefore, in the context of that case it made sense that the subcontractor's claims were not material to the government's

25

decision, because the government had already dispensed its payment before the subcontractor made the false claim and the subcontractor in no way was trying to influence the government's decision to pay the claim.

Relator contrasts this with the facts in this case by explaining that Medicare and Medicaid are set up differently than the contract arrangement in *Allison Engine*. He asserts that while Defendants submitted their claims to private intermediaries, a point this Court will take up in the next section of this opinion, the certifications of compliance were necessary for the government to provide the reimbursements. He points to other cases that have held Medicare and Medicaid claims actionable under the FCA. For example, he quotes *United States ex rel. Ven-a-Care v. Acatvis Mid Atlantic LLC,* extensively for the proposition that "[v]irtually every court that has considered the issue . . . has found that Medicaid fraud claims are actionable" under the FCA. 659 F.Supp.2d 262, 269 (D.Mass. 2009) (collecting cases). The court in that case went on to say:

> Here, the funding structure is critically different from the structure in *Allison Engine*: each claim submitted to Medicaid leads to a federal outlay—there is nothing 'attenuated' about it. It is well established that a defendant intends the natural consequences of its actions . . . Given the structure of the Medicaid system, the natural and foreseeable consequence of submitting a false claim to Medicaid is that the United States will provide funds to pay the false claim.

*Id.* at 270. Relator argues that this language is accurate and applicable to the case at hand. He argues that since Medicare and Medicaid are federal programs that are administered within the states in similar ways, the same logic that prevailed in *Ven-a-Care* should likewise be valid in this case, despite the jurisdictional difference. Specifically, Relator contends the natural and foreseeable consequence of submitting false claims to intermediaries, who he claims are mere agents of the government, is that the government will provide funds to pay the false claims. This is especially so because certain courts

have held that compliance with the AKS is a condition of payment by the Medicare and Medicaid program. *See, e.g.*, *United States v. Rogan,* 459 F.Supp.2d 692, 717 (N.D.Ill. 2006) (citing *United States ex rel. Barret v. Columbia/HCA Health Care Corp.*, 251 F.Supp.2d 28, 32 (D.D.C. 2003)).

As Relator made clear in his brief, there is a general trend by courts, including those decisions post-*Allison Engine*, to treat false certifications as material and therefore actionable under the FCA; however, that trend has not been universal in all situations. For example, in a federal district court in the Western District of Texas, a post-trial motion for judgment as a matter of law was granted against a relator for not sufficiently proving up his case that certification was a condition of payment. *United States ex rel. Gonzalez v. Fresenius Medical Care North America*, 748 F.Supp.2d 95, 111 (W.D.Tex. 2010). The court in that case did not assume that Medicare and Medicaid require explicit certification for reimbursements. While the cost reports submitted in that case contained language requiring compliance with federal law, the relator presented no evidence that the certification was a *condition* of payment. The court did note that in *Thompson v. Columbia/HCA Healthcare*, a Southern District case which was remanded from the Fifth Circuit in relation to this issue, the relator did present sufficient evidence to survive summary judgment by submitting an affidavit from a former official in the Medicare Program stating that the relevant agency relied on the certifications in question in determining the issues of payment. *Gonzalez,* 748 F.Supp.2d at 111 (citing *Thompson v. Columbia/HCA Healthcare* 20 F.Supp. 1017, 1046 (S.D.Tex. 1998)).

While this Court is not bound by the reasoning in *Gonzalez*, it does not need to find that its conclusion is an incorrect interpretation of the law to deny the motion if

evidence raises a fact issue. Relator makes several logical extrapolations and conclusions about the certifications, but the Court is reluctant to rule without being able to conclude there is a fact question. Considering Counsels' interpretation of one of this Court's orders (Doc. No. 40), Relator's lack of detailed/expansive summary judgment evidence is understandable.  Counsel for Relator mentioned at the summary judgment hearing that discovery in this case has been frozen for some time. As mentioned above, this Court, pursuant to the request of both parties, abated the deadlines in this case, but it was not this Court's intention to abate discovery other than that tied to the limitations issue. Nevertheless, both parties seemed to have read the Order in a broader fashion.  Relator's Counsel represented to this Court that he intended to provide both the cost reports and depositions of key individuals once discovery was re-opened. This Court hereby denies Defendants' motion on this point with leave to refile after a reasonable period of discovery has taken place.

### ii. Payment by the Government

The fourth and final prong of the test for § 3729(a)(2) liability relating to payment from the government is more straight-forward than the materiality issue. Defendants again rely very heavily on *Allison Engine* for their position that the payment must come directly from the government, not an intermediary, even if the intermediary is using government funds to make the payment. Relator responds that this is simply a misreading of *Allison Engine* that only contains a half-truth.

Both parties agree that private intermediaries process the Medicare and Medicaid claims of Defendants. In this case, TrailBlazer Health Enterprises, LLC ("TrailBlazer") dealt with the Medicare claims while Texas Medicaid & Healthcare Partnership

("TMHP") dealt with the Medicaid claims. TrailBlazer is under contract with the federal government and TMHP contracts with the State of Texas. Defendants point to this fact and the language of *Allison Engine* stating "'paid . . . by the Government' is not the same thing as getting a false or fraudulent claim paid using 'government funds'" to support their position that Relator's allegations are meritless because the government never directly paid the false claims. 553 U.S. at 669.  However, as Relator points out, boiling *Allison Engine* down to a simple holding that all payments not given directly by the government to the entity making the false claim is a mischaracterization of the case. Indeed, the Supreme Court expressly states:

> A subcontractor violates § 3729(a)(2) if the subcontractor submits a false statement to the prime contractor intending for the statement to be used by the prime contractor to get the Government to pay its claim.

*Id.* at 671. Therefore, a payment does not have to be received directly from a governmental entity in order to constitute a payment or approval by the government, so long as the defendant intended the government to pay the claim. *Allison Engine* reiterated this point by highlighting that 3729(c)'s language (providing that a "claim" may be made to a contractor, grantee, or other recipient of Government funding) makes clear that there can be FCA liability under 3729(a)(2) when the original request for money was made to an intermediary then forwarded to the government. *Id.* at 670 n.1.

Relator cites to this language in support of his contention that a false claim can be submitted to an intermediary in certain factual situations distinct from *Allison Engine*. Relator argues that the present case is different from *Allison Engine* in that Medicare and Medicaid are set up so that they use third-party intermediaries to administer claims and payments.   TrailBlazer and TMHP are nothing more than agents of the federal government in Relator's estimation. While this Court is unwilling to hold that they are

29

nothing more than agents of the federal government, it does hold that the natural and foreseeable consequence of submitting a claim to these intermediaries is payment from the government.

The Court agrees with Relator's assertions that this is a factually distinct case from *Allison Engine*, and that *Allison Engine*'s own language supports his position. Moreover, TrailBlazer and TMHP have contracts with the government wherein there is a continuing relationship with the government. *See* 42 C.F.R. § 413.20. This is not a situation where the government makes a block grant payment to a contractor who then utilizes the money as he best sees fit; rather, this is a situation where it is very clear the government will be paying the bill in an ongoing arrangement. Thus, Relator has shown, as a matter of law, that Medicare and Medicaid claims can be paid by the government, and he has satisfied prong four of the test enunciated in *Longhi*. 575 F.3d at 467.

Since the Court has determined that this cause of action should survive at this stage of the litigation, Defendants' motion on Relator's § 3729(a)(2) claim is hereby denied. Nevertheless, Defendants are entitled to refile their motion as to "materiality" after a reasonable period of discovery has taken place.


### B.  § 3729(a)(3) Claim

Defendants move for summary judgment on Relator's 31 U.S.C. § 3729(a)(3) claim because they claim there is no evidence that there was a conspiracy among Defendants and certain physicians to bring about payment from the government.

The elements of a claim under 31 U.S.C. § 3729(a)(3) are: (1) existence of an unlawful agreement between defendants to get a false or fraudulent claim allowed or paid by the government and (2) at least one act performed in furtherance of that agreement.

*United States ex rel. Farmer v. City of Houston*, 523 F.3d 333, 343 (5th Cir. 2008).

*Allison Engine* held that the same logic applied to § 3729(a)(3) claims as it did to § 3729(a)(2) claims, that is "it must be shown that the conspirators had the purpose of 'getting' the false record or statement to bring about the Government's payment of a false or fraudulent claim." *Allison Engine* at 672–73. The Court further clarified that it is not necessary for the claims to be directly presented to the government, but it must be shown that the conspirators agreed that the false statement would have a material effect on the government's decision to pay the claim.

While Relator makes a § 3729(a)(3) allegation in his Amended Complaint (Doc. No. 24), he fails to address the issue in his Response to Defendants' Motion for Summary Judgment Regarding the False Claims Act. The Fifth Circuit has held that a party is considered to have abandoned a claim if he inadequately briefs the issue. *See Friou v. Phillips Petroleum Co.,* 948 F.2d 972, 974 (5th Cir.1991). Furthermore, district courts in the Fifth Circuit have found a plaintiff to have waived their claim where it was not addressed in their response to the defendant's motion for summary judgment. *See Lopez v. River Oaks Imaging & Diagnostic Grp., Inc.,* 542 F.Supp.2d 653, 659 n.9 (S.D.Tex. 2008); *Hill v. Sodexho Servs. of Tex., L.P.,* 2007 WL 4234261, at *2 n.1 (W.D.Tex. 2007). Under the Local Rules of the Southern District of Texas, "[f]ailure to respond will be taken as a representation of no opposition." S.D. TEX. LOC. R. 7.4. Despite this rule, a federal court may not grant a motion for summary judgment merely because the non-movant "defaulted" by failing to respond. *Eversley v. MBank Dallas*, 843 F.2d 172, 174 (5th Cir. 1988) (citing *Hibernia National Bank v. Administracion Central Sociedad Anonima*, 776 F.2d 1277, 1279 (5th Cir. 1985)). However, a court *may* treat the facts

31

provided in the motion for summary judgment as undisputed. *Id.*; *see also Murphy v. Spears Mfg. Co., Inc.*, No. Civ. A. H-10-4258, 2011 WL 4916205, *2 (S.D.Tex. Oct. 17, 2011). Defendants argue that there is no evidence of an agreement between Defendants and certain physicians to defraud the government. Relator has pointed to no evidence refuting this claim, and this Court has seen no summary judgment argument or evidence raising a fact issue as to whether there was an agreement involving Defendants. No issue of material fact has been raised to the Court. Therefore, Defendants' motion is granted as to the § 3729(a)(3) claim.

### C. Public Disclosure

Defendants additionally move to dismiss Relator's action as a matter of law on the grounds that the Court has no jurisdiction over this case. The False Claims Act contains a public disclosure bar, which deprives courts of jurisdiction over *qui tam* suits when the relevant information has already entered the public domain through certain channels. *Graham Soil & Water Conservation District v. United States ex. Rel. Wilson*, 130 S.Ct. 1396, 1401 (2010). Defendants assert that this Court does not have jurisdiction because they disclosed the XOL Program to the DOJ in an administrative investigation. 31 U.S.C. § 3730(e)(4)(A)–(B) states that:

> (4)(A) No court shall have jurisdiction over an action under this section based upon public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information
>
> (B) For purposes of this paragraph, "original source" means an individual who has direct and independent knowledge of the information on which the allegations are based and

has voluntarily provided the information to the Government before filing an action under this section which is based on the information.[12]

The Fifth Circuit has held that, with regard to the public disclosure bar under the FCA, a relator is not required to prove a negative by showing that there were no public disclosures of allegations or transactions upon which his action is based. *United States ex rel. Jamison v. McKesson Corp.*, 649 F.3d 322, 327 (5th Cir. 2011). "Nonetheless, once the opposing party has identified public documents that could plausibly contain allegations or transactions upon which the relator's action is based, the relator bears the burden of demonstrating they do not." *Id.*

Defendants disclosed information, including documents related to the XOL Program, in response to a subpoena issued by the United States Department of Health and Human Services ("DHHS")[13] as part of an investigation into potential Stark Law violations concerning a compensation arrangement with a particular doctor. They claim that this is a public disclosure in an administrative investigation, as laid out in the statute. Relator argues that this is not the type of disclosure contemplated in the statute because it (1) was not public and (2) his suit is not "based upon" the disclosure.

In their Motion, Defendants do not devote a great deal of energy to their argument regarding the public disclosure. They cite no case law and repeatedly point to the language of the statute as proof of their claim. While the literal language does look helpful to Defendants, considering that a DOJ investigation seems to fit within the

---

[12] This statute was amended in 2010, and its effective date was July 22, 2010. However, the Fifth Circuit has held that the amendment is not retroactive. Therefore, this opinion uses the unamended form. *See United States ex rel. Jamison v. McKesson Corp.*, 649 F.3d 322, 326 n.6 (5th Cir. 2011).

[13] Defendants in their briefing and in their oral argument have referred to disclosures to the Department of Justice ("DOJ"). The evidence submitted contains a subpoena Duces Tecum from DHHS. A letter addressed to an individual at the DOJ indicates that the documents submitted in response to the subpoena were sent to the DOJ. For the sake of consistency and to avoid confusion, the Court will use Defendants' method of referring to this as the "DOJ investigation," despite the involvement of multiple federal agencies.

parameters of an "administrative investigation" in § 3730(e)(4)(A), the interpretation of the statute has been hotly contested.

Importantly for this case, it is not quite clear whether the enumerated avenues of disclosure in § 3730, in and of themselves, constitute a public disclosure or whether the statute actually says that *a public disclosure* via the enumerated avenues is per se barred (implying that an administrative hearing or investigation that was kept confidential would not be barred).

The purpose of the jurisdictional bar is to accommodate the primary goals of the FCA, namely (1) promoting private citizen involvement in exposing fraud against the government and (2) preventing parasitic suits by opportunistic late-comers who add nothing to the exposure of fraud. *United States ex rel. Reagan v. E. Tex. Med. Ctr.*, 384 F.3d 168, 174 (5th Cir. 2004). Accordingly, in interpreting the statute this Court will construe the language to be consistent with its purposes, whenever possible.

Relator claims that Defendants' contention fails because there is no evidence the information given to the DOJ pursuant to the subpoena was ever *publicly* disclosed. Relator does not simply rely on the statutory language, but cites precedent from other jurisdictions to bolster his argument. For example, the Tenth Circuit held "that insofar as the communication does not release the information into the public domain such that it is accessible to the general population it is not [a "public disclosure" within the meaning of § 3730(e)(4)]. *United States ex rel. Maxwell v. Kerr-McGee Oil & Gas Corp.,* 540 F.3d 1180, 1184 (10th Cir. 2008). In *Maxwell*, the disclosure in question was an email from a federal employee to a state government auditor, who was obligated to keep the information confidential. The court held that this type of communication was not a public

disclosure because no one in the public domain could access the information. It also cited

other cases which have held that discovery material is only publicly disclosed if it is filed

with the court. *Id.* at 1186. Nevertheless, the court made clear that it was only addressing

its particular fact situation, and was not ruling on the situation involving a recipient of

information who is not duty-bound to confidentiality.

Relator also quotes a Wisconsin district court, whose language strongly supports

his reading of the statute:

> Analysis of the rationale governing these cases, and the purposes underlying the FCA,
> yields the following principle: aside from disclosures resulting from news media
> exposure, public disclosure occurs when the government has affirmatively provided to
> members of the general public access to information upon which the FCA claim is
> based. The lynchpin of this formulation of the public disclosure test is the requirement
> that the government perform some affirmative act of disclosure. The mere existence of
> a report, audit, or investigation containing information pertaining to fraud does not, in
> and of itself, constitute public disclosure.

*United States ex rel. Fallon v. Accudyn Corp.*, 921 F.Supp. 611, 625 (W.D. Wis. 1995).

While this language is extremely helpful to Relator, it is not binding on this Court and

recent Supreme Court jurisprudence may cast doubt on its accuracy.

In *Schindler Elevator Corp. v. United States ex rel. Kirk*, the Supreme Court held

that responses to Freedom of Information Act ("FOIA") requests by the Department of

Labor were "reports" subject to FCA's public disclosure bar. 131 S.Ct. 1885, 1890

(2011). Defendants argued to this Court that *Schindler* suggests that if information is

available through a FOIA request it would satisfy the public disclosure component.

Relator responded that such a reading of *Schindler* is simply wrong. He argued that if

information has been obtained and released pursuant to a FOIA request, then the

government has affirmatively acted to disclose that information—in keeping with the

holding of *Fallon*. While *Schindler* stressed a plain reading of the public disclosure bar,

35

as well as warning against overly-narrow construction, the reasoning of the Supreme Court and the purpose of the statute lead this Court to find that there was no public disclosure in the present case. 131 S.Ct. at 1892.

First, Relator's case is easily distinguishable from *Schindler*. In *Schindler*, the bulk of the Court's energy was focused on determining whether a response to a FOIA request is a report. The Court basically took for granted the fact that the response was publicly disclosed since any member of the public is able to gain access to the information by making a similar FOIA request. In this case, Relator is not disputing that there was an administrative investigation, only that such an investigation was publicly disclosed. *Schindler* stressed, quoting another recent Supreme Court decision regarding the FCA, "the sole 'touchstone' in the statutory text is 'public disclosure." *Id. Graham County*, the case *Schindler* quotes, went even further by stating that what is essential is "whether the allegations of fraud have been publicly disclosed not whether they have landed on the desk of a DOJ lawyer." 130 S.Ct. at 1410. These quotes suggest that the *sine qua non* is public disclosure, rather than the form the disclosure takes.

While the Fifth Circuit has not looked at this question directly, the language they have used in recent cases suggests they require the information to be accessible by the public before barring a *qui tam* suit. The Fifth Circuit boils the 3730(e)(4) to a 3-part test, asking:

> 1) Whether there has been a "public disclosure" of allegations or transactions,
> 2) whether the qui tam action is "based upon" such publicly disclosed allegations, and
> 3) if so, whether the relator is the "original source" of the information

*Jamison*, 649 F.3d at 327. A district court recently broke down the first prong of the test, explaining there are three sub-parts to the public disclosure prong: "The plain language of

the statute suggests that there are three sub-parts to the public disclosure prong: (1) the public disclosure; (2) in a particular form specified in the statute, such as an administrative report or hearing; (3) of allegations or transactions." *United States ex rel. Dekort v. Integrated Coast Guard Systems*, 705 F.Supp.2d 519, 554 (N.D.Tex. 2010) (quoting *United States ex rel. Barrett v. Johnson Controls, Inc.*, 2003 WL 21500400, at *4 (N.D.Tex. 2003)).

There is no indication from Defendants' summary judgment evidence that the information regarding the XOL Program they provided pursuant to the subpoena was ever in the public domain or accessible by the public. Relator denies that it was ever publicly disclosed. Relator cites to paragraph nine of his declaration to prove that he was never in possession nor aware of what information Defendants disclosed to the DOJ in 2002, nor aware of any information being publicly disclosed. Paragraph nine of his declaration states:[14]

> Paragraph 8 of the Stark MSJ suggests that the plan was terminated in 2003; it was not terminated in 2003. The XOL Plan ended in July of 2004, but funds remained in the Trust and review/administration/contingent payment of claims made and potential claims continued until the balance of the Trust was liquidated from the Trust and deposited into the Defendants' general income accounts in 2007.

(Doc. No. 43-2 at ¶9). It is obvious that this paragraph is not related in any way to the public disclosures.[15] Relator has produced no other evidence that the documents were not

---

[14] This is the language from the Original Swetnam Declaration rather than the Amended Declaration because that is the version to which Relator's Response refers. The Amended Swetnam Declaration does supplement this paragraph, but only to establish Relator's basis of knowledge. It likewise does not mention anything relevant to the public disclosure issue.

[15] Counsel for Relator in this, and at least one other important area, have claimed that certain "evidence" exists in Relator's Declaration when it, in fact, does not. Counsel should be warned that such practice certainly undermines their credibility before this Court and could be grounds for this Court to strike the response in its totality, which would certainly not be beneficial to either Relator or counsel.

publicly disclosed. Therefore, if there is any evidence that shows the documents were not publicly disclosed it must necessarily come from Defendants' own exhibits.

In order for there to be a public disclosure, it only stands to reason (and similar courts have agreed) that the allegations and transactions need to be accessible to the public. In Defendants' summary judgment evidence, the lawyer who provided the documents to the DOJ requested that "we ask that the enclosed documents be maintained in a confidential manner, as portions of them relate to the health status of individuals or the business operations of Valley Baptist Medical Development Corporation or the Valley Baptist Medical Center." (Doc. 38-11, 4 of 44). This shows an expectation of privacy by Defendants, militating against their claim that such information was accessible to the public. Further, assuming that *Schindler* stands for the proposition that information subject to a FOIA request is publicly disclosed even in the absence of a FOIA request, which this Court does not believe it does, Defendants have submitted no evidence that the information provided to the DOJ would be subject to such a request or that it was or could have been otherwise disclosed. Therefore, the Court finds that it has subject matter jurisdiction over this case because the information provided to the DOJ was never publicly disclosed. Finding that the documents were never public, Relator does not bear the burden of producing evidence to demonstrate that they could not plausibly contain allegations or transactions upon which his action is based. Further, even if the Court is wrong that the DOJ investigation constitutes a public disclosure, Defendants summary judgment evidence, including the letter requesting that the documents be kept confidentially, at least raises a fact issue that should survive summary judgment.

Additionally, since the Court has found the information was never publicly disclosed, it does not need to reach the question of whether Swetnam was an original source.[16]

## V. CONCLUSION

Therefore, the Court **ORDERS** that Defendants' Motion for Summary Judgment Regarding Stark and Anti-Kick Statute (Doc. No. 37) is hereby **GRANTED in part and DENIED in part**. Defendants' Motion for Summary Judgment Regarding the False Claims Act (Doc. No. 38) is hereby **GRANTED in part and DENIED in part.** Defendants are granted leave to file a subsequent motion for summary judgment with regard to the materiality prong of Relator's 31 U.S.C. § 3729(a)(2) claim after a reasonable period of discovery has taken place.

Signed this 6 day of August, 2012.

Andrew S. Hanen
United States District Judge

---

[16] Since the Court is holding there was no public disclosure in this case, it also need not decide whether the action was "based upon" the allegedly publicly available information.

39