UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, EX REL. MICHAEL N. SWETNAM, JR., | § § § § § | |
| Plaintiff, | § § | |
| VS. | § § § | CASE NO. 1:08-CV-446 |
| VALLEY BAPTIST HEALTH SYSTEM AND VALLEY BAPTIST MEDICAL CENTER, | § § § § § | |
| Defendants. | § | |

## SECOND AMENDED COMPLAINT

COMES NOW, the United States of America, ex rel. Michael N. Swetnam, Jr., by and through its attorney of record, and for its Second Amended Complaint states:

### JURISDICTION AND VENUE

1.  This action arises under the False Claims Act, as amended, 31 U.S.C. §§ 3729-33. This Court has jurisdiction over this action under 31 U.S.C. § 3730(a) and 28 U.S.C. §§ 1345 and 1367(a).

2.  Venue is proper in the Southern District of Texas, Brownsville Division, pursuant to 28 U.S.C. § 1391(b) and 31 U.S.C. § 3732(a). Defendants previously appeared in this Cause without contesting venue in the Southern District of Texas—Brownsville Division.

### PARTIES

3.  Plaintiff The United States of America, acting through the Department of Health and Human Services (hereinafter "HHS"), administers the Health Insurance Program for the Aged and Disabled established by Title XVIII of the Social Security Act (hereinafter "Act"), 42 U.S.C. §§ 1395 *et seq.* (hereinafter "Medicare"), and Grants to

States for Medical Assistance Programs pursuant to Title XIX of the Act, 42, U.S.C. §§ 1396 *et seq.* (hereinafter "Medicaid").

4.      Relator Michael N. Swetnam, Jr. is an individual with a principal residential address of 3099Y Whipple Road, Los Fresnos, Cameron County, Texas.

5.      Defendant Valley Baptist Health System is an integrated healthcare delivery system that was incorporated on August 29, 2000 as a 501(c)(3) non-profit corporation with its principal place of business located at 2101 Pease Street, Harlingen, Cameron County, Texas 78550.  Defendant Valley Baptist Health System is within and/or has done business within the jurisdiction of the Court and operates under the control of the Baptist General Convention of Texas.  Defendant Valley Baptist Health System may be served with this Second Amended Complaint through its counsel of record, Mr. Christopher Paul Hanslik, BOYAR & MILLER PC, 4265 San Felipe, Suite 1200, Houston, Texas 77027.

6.      Defendant Valley Baptist Medical Center is a wholly owned and controlled subsidiary of Valley Baptist Health System and has been incorporated as a 501(c)(3) non-profit corporation with its principal place of business located at 2101 Pease Street, Harlingen, Cameron County, Texas 78550.  Defendant Valley Baptist Medical Center is within and/or has done business within the jurisdiction of the Court and operates under the control of the Baptist General Convention of Texas.  Defendant Valley Baptist Medical Center may be served with this Second Amended Complaint through its counsel of record, Mr. Christopher Paul Hanslik & Mr. Michel Perez, BOYAR & MILLER PC, 4265 San Felipe, Suite 1200, Houston, Texas 77027.

## THE LAW

7.      The False Claims Act (FCA) provides, in pertinent part that:

    (a)    Any person who (1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval; (2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government; [or] (3) conspires to defraud the Government by getting a false or fraudulent claim paid or approved by the Government,

\* \* \*

    is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages which the Government sustains because of the act of that person. . .

    (b)    For purposes of this section, the terms "knowing" and "knowingly" mean that a person, with respect to information (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the trust or falsity of the information; or (3) acts in reckless disregard of the trust or falsity of the information, and no proof of specific intent to defraud is required.

31 U.S.C. § 3729.

    8.    The Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), arose out of congressional concern that payoffs to those who can influence healthcare decisions would result in goods and services being provided that are medically unnecessary, of poor quality, or even harmful to a vulnerable patient population. To protect the integrity of the program from these difficult-to-detect harms, Congress enacted a *per se* prohibition against the payment of kickbacks in any form, regardless of whether the particular kickback gave rise to over utilization or poor quality of care. First enacted in 1972, Congress strengthened the statute in 1977 and 1987 to ensure that kickbacks masquerading as legitimate transactions did not evade its reach. *See,* Social Security Amendments of 1972, Pub. L. No. 92-603, §§242(b) and (c); 42 U.S.C. § 1320a-76,

Medicare-Medicaid Antifraud and Abuse Amendments, Pub. L. No. 95-142; Medicare and Medicaid Patient and Program Protection Act of 1987, Pub. L. No. 100-93.

9. The Anti-Kickback Statute prohibits any person or entity from making or accepting payment to induce or reward any person for referring, recommending or arranging for federally-funded medical services, including services provided under the Medicare and Medicaid programs.

> (b) Illegal remuneration
>
> * * *
>
> (2) whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person –
>
>> (A) to refer an individually to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or
>>
>> (B) to purchase, lease, order or arrange for or recommend purchasing, leasing or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program,
>
> shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

42 U.S.C. § 1320a-7b(b). Violation of the statute can also subject the perpetrator to exclusion from participation in federal health care programs and, effective August 6, 1997, civil monetary penalties of $50,000 per violation and three times the amount of remuneration paid. 42 U.S.C. § 1320a-7(b)(7) and 42 U.S.C. § 1320a-7a(a)(7).

10. The Anti-Kickback Statute does provide several very specific "safe harbors" for arrangements and/or payment practices that do not constitute violations

of the Statute. For example, amongst others, the Anti-Kickback Statute and Code of Federal Regulations provide "safe harbor" protection for certain –

    (a)    space rental agreements (42 U.S.C. § 1320a-7b(b)(3)(E) and 42 C.F.R. § 1001.952(b));

    (b)    equipment rental agreements (42 U.S.C. § 1320a-7b(b)(3)(E) and 42 C.F.R. § 1001.952(c));

    (c)    personal services and management contracts (42 U.S.C. § 1320a-7b(b)(3)(E) and 42 C.F.R. § 1001.952(d));

    (d)    physician recruitment arrangements (42 U.S.C. § 1320a-7b(b)(3)(E) and 42 C.F.R. § 1001.952(n));

    (e)    increased coverage, reduced cost-sharing amounts or reduced premium amounts offered to certain health plans to enrollees (42 U.S.C. § 1320a-7b(b)(3)(E) and 42 C.F.R. § 1001.952(l));

    (f)    referral services (42 U.S.C. § 1320a-7b(b)(3)(E) and 42 C.F.R. § 1001.952(f));

    (g)    subsidies for obstetrical malpractice insurance in underserved areas (42 U.S.C. § 1320a-7b(b)(3)(E) and 42 C.F.R. § 1001.952(o));

    (h)    specialty referral arrangements between providers (42 U.S.C. § 1320a-7b(b)(3)(E) and 42 C.F.R. § 1001.952(s)); and

    (i)    cooperative hospital services organizations (42 U.S.C. § 1320a-7b(b)(3)(E) and 42 C.F.R. § 1001.952(q)).

11.    Importantly, each statutory "safe harbor" carries a long list of applicable standards that must be met before the "safe harbor" protection applies. *See* 42 U.S.C. § 1320a-7b(b)(3)(E) and 42 C.F.R. § 1001.952.

12.    As detailed below, Defendants' actions do not meet the required standards for application of the Anti-Kickback Statute's "safe harbor" protection.

**THE MEDICARE AND MEDICAID PROGRAM**

**SECOND AMENDED COMPLAINT** – Page 5

13. In 1965, Congress enacted Title XVIII of the Social Security Act, known as the Medicare program, to pay for the costs of certain healthcare services. Entitlement to Medicare is based on age, disability or affliction with end-stage renal disease. *See* 42 U.S.C. §§ 426, 426A. Part A of the Medicare Program authorizes payment for institutional care, including hospital, skilled nursing facility and home health care. *See* 42 U.S.C. §§ 1395c-1395i-4.

14. HHS is responsible for the administration and supervision of the Medicare program. The Centers for Medicare and Medicaid Services (hereinafter "CMS") is an agency of HHS and is directly responsible for the administration of the Medicare program.

15. Under the Medicare program, CMS makes payments retrospectively (after the services are rendered) to hospitals for inpatient and outpatient services. Medicare enters into provider agreements with hospitals in order to establish the hospitals' eligibility to participate in the Medicare program. However, Medicare does not prospectively contract with hospitals to provide particular services for particular patients. Any benefits derived from those services are derived solely by the patients and not by Medicare or the United States.

16. As detailed below, Defendants submitted or caused to be submitted claims both for specific services provided to individual beneficiaries and claims for general and administrative costs incurred in treating Medicare beneficiaries.

17. To assist in the administration of Medicare Part A, CMS contracts with "fiscal intermediaries." 42 U.S.C. § 1395h. Fiscal intermediaries, typically insurance companies, are responsible for processing and paying claims and cost reports.

18. Upon discharge of Medicare beneficiaries from a hospital, the hospital submits claims for interim reimbursement for items and services delivered to those

beneficiaries during their hospital stays. 42 C.F.R. §§ 413.1, 413.60, 413.64. Hospitals submit patient-specific claims for interim payments on a Form UB-92.

19. As a prerequisite to payment by Medicare, CMS requires hospitals to submit annually a form CMS-2552, more commonly known as the hospital cost report. Cost reports are the final claim that a provider submits to the fiscal intermediary for items and services rendered to Medicare beneficiaries.

20. After the end of each hospital's fiscal year, the hospital files its hospital cost report with the fiscal intermediary, stating the amount of reimbursement the provider believes it is due for the year. *See* 42 U.S.C. § 1395g(a); 42 C.F.R. § 413.20. *See also* 42 C.F.R. § 405.1801(b)(1). Hence, Medicare relies upon the hospital cost report to determine whether the provider is entitled to more reimbursement than already received through interim payments, or whether the provider has been overpaid and must reimburse Medicare. 42 C.F.R. §§ 405.1803, 4136.60 and 413.64(f)(1).

21. Defendants were, at all times relevant to this Complaint, required to submit annually a hospital cost report to the fiscal intermediary.

22. During the relevant time period, Medicare payments for hospital services were determined by the claims submitted by the provider for particular patient discharges (specifically listed on UB-92s) during the course of the fiscal year. On the hospital cost report, this Medicare liability for services is then totaled with any other Medicare liabilities to the provider. This total determines Medicare's true liability for services rendered to Medicare beneficiaries during the course of a fiscal year. From this sum, the payments made to the provider during the year are subtracted to determine the amount due to the Medicare program or the amount due to the provider.

23. Under the rules applicable at all times relevant to this Complaint, Medicare, through its fiscal intermediaries, had the right to audit the hospital cost

reports and financial representations made by Defendants to ensure their accuracy and preserve the integrity of the Medicare Trust Funds. This right includes the right to make retroactive adjustments to hospital cost reports previously submitted by a provider if any overpayments have been made. 42 C.F.R. § 413.64(f).

24. Every hospital cost report contains a "Certification" that must be signed by the chief administrator of the provider or a responsible designee of the administrator.

25. At all times relevant to this Complaint, the hospital cost report certification page included a notice that misrepresentation or falsification of any information contained in the cost report may be punishable by criminal, civil and administrative action, fine and/or imprisonment under federal law. Furthermore, the hospital cost report certification page included notice that if services identified in the report were provided or procured through the payment directly or indirectly of a kickback or were otherwise illegal, criminal, civil and administrative action, fines and/or imprisonment may result.

26. At all times relevant to this Complaint, the responsible provider official was required to certify, in pertinent part:

> "to the best of my knowledge and belief, it [the hospital cost report] is a true, correct and complete statement prepared from the books and records of the provider in accordance with applicable instructions except as noted.
>
> I further certify that I am familiar with the laws and regulations regarding the provision of health care services, and that the services identified in this cost report were provided in compliance with such laws and regulations."

27. Thus, the provider was required to certify that the filed hospital cost report is (1) truthful, *i.e.*, that the cost information contained in the report is true and accurate; (2) correct, *i.e.*, that the provider is entitled to reimbursement for the reported

costs in accordance with applicable instructions; (3) complete, *i.e.*, that the hospital cost report is based upon all information known to the provider; and (4) that the services provided in the cost report were not affected by kickbacks and were billed in compliance with the Stark Statute.

28. A hospital is required to disclose all known errors and omissions in its claims for Medicare reimbursement (including its cost reports) to its fiscal intermediary. 42 U.S.C. § 1320a-76(a)(3) specifically creates a duty to disclose known errors in cost reports:

> "Whoever. . .having knowledge of the occurrence of any event affecting (A) his initial or continued right to any such benefit or payment. . .conceals or fails to disclose such event with an intent fraudulently to secure such benefit or payment either in a greater amount or quantity than is due or when no such benefit or payment is authorized. . .shall in the case of such a. . .concealment or failure. . .be guilty of a felony."

29. Defendants submitted cost reports at all times material to this Complaint. Defendants caused the cost reports to be submitted and signed in different years by Mr. Ben McKibbens, Mr. Billy Joe Simpson, Mr. E. Wayne Lee, Mr. James G. Springfield, Mr. Randy McLelland, Mr. Robert Dunkin, Mr. William Elliff and/or Mr. Bruce Liebert who attested, among other things, to the certification quoted above.

30. Medicaid is a joint federal-state program that provides health care benefits for certain groups, primarily the poor and disabled. The federal involvement in Medicaid is largely limited to providing matching funds and ensuring that states comply with minimum standards in the administration of the program.

31. The federal Medicaid statute sets forth the minimum requirements for state Medicaid programs to qualify for federal funding, which is called federal financial participation (hereinafter "FFP"). 42 U.S.C. §§ 1396 *et seq.*

32. Each state's Medicaid program must cover hospital services. 42 U.S.C. § 1396(a)(1)(A), 42 U.S.C. § 1396d(a)(1)-(2).

33. In Texas, before January 1, 2004, provider hospitals participating in the Medicaid program submitted claims for hospital services rendered to beneficiaries to the Texas Health & Human Services Commission through the National Heritage Insurance Company.

34. On January 1, 2004, the Texas Medicaid and Healthcare Partnership assumed administration of Medicaid claims processing and the Medicaid primary care case management services program.

## THE ILLEGAL KICKBACK SCHEME

35. In April of 1984, Smith-Reagan & Associates, Inc. (hereinafter "Smith-Reagan") was the insurance agent of record for the Valley Baptist Health System (hereinafter "VBHS") and its wholly owned and operated subsidiary Valley Baptist Medical Center (hereinafter "VBMC"). Relator Michael N. Swetnam, Jr., as a partner in Smith-Reagan, began managing the insurance program for Defendants over the 1985 renewal cycle and handled all aspects of the account from 1985 until 2007.

36. In 1992, the physician medical professional liability insurance markets in Texas restricted their underwriting of and increased premiums charged for South Texas physicians due to changes in the legal environment and several adverse court decisions against physicians with practices in Hidalgo and Cameron Counties, Texas. These premium increases had a great financial impact on surgeons and less of an impact on non-surgeons.

37. The market increases in insurance premiums caused Defendants' medical staff to challenge Defendants' administration and Board members concerning the

medical staff by-law minimum limit of liability insurance requirements of $500,000 per claim/$1,000,000 aggregate for physician medical professional liability insurance.

38. In fact, several of the larger physician groups threatened to move their patients to different hospitals that required lower physician medical professional liability insurance limits of liability than the $500,000 per claim/$1,000,000 aggregate limits of liability required by Defendants.

39. At the time, the other area hospitals required the physicians on their medical staffs to maintain physician professional liability insurance of just $100,000 per claim/$300,000 aggregate limits of liability or in some cases, $200,000 per claim/$600,000 aggregate. For example, at the time, Dolly Vinsant Memorial Hospital in San Benito, Texas only required its medical staff physicians to maintain physician professional liability insurance with limits of liability of $100,000 per claim/$300,000 aggregate.

40. Given the threats it was facing, in 1993, Defendants' CEO, Ben M. McKibbens, and administration gave Smith-Reagan a mandate to find a solution for their physicians medical staff's insurance "problem" that (1) allowed Defendants to keep their current medical staff by-law insurance requirement for physician medical professional liability insurance minimum limit of liability at $500,000/$1,000,000 while (2) costing less than the current medical professional liability insurance premiums that were offered in the market at that time.

41. In response, in 1993, Smith-Reagan wrote a manuscript physicians excess of loss professional liability insurance policy that was designed to be similar to a risk purchasing group insurance policy format.

42. In particular, this manuscript policy provided each attending, associate attending and provisional associate attending member of VBMC who agreed to staff the

emergency room on an "on call" basis and opted to participate in the VBMC Physician Excess of Loss Self-Insurance Plan with $300,000 of coverage for any one physician claim, $900,000 aggregate any one physician for all claims and $9,000,000 aggregate all physician claims.

43. Smith-Reagan through Relator Michael N. Swetnam, Jr. then structured stop loss reinsurance for this manuscript insurance policy which would reimburse the VBMC physician excess of loss self-insurance plan trust fund for paid claims that exceeded the stop loss reinsurance policy's claim retention of $300,000 any one physician claim; $900,000 aggregate any one physician for all claims and subject to a stop loss reinsurance policy aggregate of $9,000,000 aggregate all physician claims. The stop loss reinsurance coverage was subject to a self-insured retention of $300,000 any one physician claim and $900,000 aggregate all claims. This excess of loss stop loss reinsurance policy would reimburse the VBMC Physicians Excess of Loss Professional Liability Self-Insurance Trust Fund and would not pay the physicians' claims directly.

44. In 1993, Defendants' Board and management employees, including Mr. Ben McKibbens, Mr. Billy Joe Simpson, Mr. Robert Dunkin and Mr. Randy McLelland reviewed Smith-Reagan's proposal and approved the purchase of the professional liability insurance policy and stop loss reinsurance policy as well as the creation of the VBMS Excess of Loss Self-Insurance Trust. Six (6) proposals were considered by Defendants' Board and managerial employees in response to the initial request by Mr. Ben McKibbens, Defendants' CEO. Defendants' approval included and was founded on certain key features of the excess of loss stop loss reinsurance policy, including provisions that "there will be no cost to physicians for the additional umbrella coverage provided by the [Defendants]", the excess of loss stop loss reinsurance policy would "not cover physicians at other hospitals", and the excess of loss stop loss reinsurance

policy was intended to "result in additional physicians becoming active staff members" at Defendants' hospitals. A true and correct copy of Defendants', 1993, Minutes of Board Meetings are attached hereto as Exhibit "E".

45. A true and correct copy of the VBMC Excess of Loss Self-Insurance Trust Agreement executed by Mr. Ben M. McKibbens as President and CEO of VBMC is attached hereto as Exhibit "A".

46. A true and correct unsigned copy of the VBMC Excess of Loss Self-Insurance Plan effective September 1, 1993 is attached hereto as Exhibit "B".

47. From 1993 until 1996, VBMC's physician excess of loss self-insurance program was implemented and operated with great financial success and little to no comment or criticism.

48. Then, in 1996, Smith-Reagan became aware of the federal "Anti-Kickback" legislation and became concerned about the physician excess of loss self-insurance program because (1) Defendants were not charging any premiums to the participating physicians for providing the excess of loss insurance coverage through the self-insurance plan; and (2) Defendants had restricted the physician excess of loss insurance coverage to only apply to claims that arose from the physician's medical practice at either the physician's private facility or the VBMC facility. In other words, if the physician had primary insurance limits of liability of $200,000 per claim/$600,000 aggregate and participated in the VBHS Excess of Loss Self-Insurance Plan, the physician had an increased, no-cost combined limit of liability of $500,000 per claim/$1,500,000 aggregate for patients that the physician treated at the VBMC facility or his/her office. On the other hand, if the physician chose to treat patients at other hospital facilities, then the physician would have professional liability coverage of only

$200,000 per claim/$600,000 aggregate and the VBMC excess of loss self-insurance plan coverage would not apply to claims that arose at other hospitals.

49.     In 1998, attorney Patsy Nichols of the law firm of Fulbright Jaworski sent a letter to Defendants advising the administration that it was the firm's legal opinion that the VBMC Physician Excess of Loss Self-Insurance Plan and Self-Insurance Trust should be discontinued immediately and the program should be dismantled as quickly as possible because of its violation of Anti-Kickback laws and the possible adverse effect they could have on Defendants' Medicare funding.

50.     In response, Defendants' administration chose to disregard the Fulbright Jaworski recommendation and instead, continued the administration of the VBMC Physician Excess of Loss Self-Insurance Plan and Self-Insurance Trust.

51.     Defendants' decision to continue with the VBMC Physician Excess of Loss Self-Insurance Plan and Self-Insurance Trust came down to simple dollars and cents. Over the life of the VBMC Physician Excess of Loss Self-Insurance Plan and Self-Insurance Trust, funding only cost Defendants a total of $7,828,642 in total insurance premiums and claim payouts.  However, by providing the plan, Defendants secured close to 100% of the local medical community's Medicare and Medicaid patient services and patient hospital services.  A true and correct of Relator Michael N. Swetnam, Jr.'s 1998 list of over 300 physicians participating in the VBMC Physician Excess of Loss Self-Insurance Plan is attached hereto as Exhibit "C".

52.     From 1998 to 2004, Defendants continued to offer and operate the VBMC Physician Excess of Loss Self-Insurance Plan and Self-Insurance Trust.  A true and correct unsigned copy of the VBMC Excess of Loss Self-Insurance Plan effective September 1, 2000 is attached hereto as Exhibit "D".

53. During that time, Relator Michael N. Swetnam, Jr. repeatedly cautioned Defendants, Defendants' Board, management and individual Board members that the program had been deemed to be in violation of federal law and as a result, in his opinion, should be dismantled.

54. Finally, in July, 2004, and only after repeated warnings, admonitions and the continued threat of serious repercussions, Defendants terminated the program.

55. Upon information and belief, in fiscal years ending August 31, 2003 and August 31, 2004, VBHS's total annual net patient service revenue was $267,483,477, and $297,701,939, respectively.

56. For fiscal year 2003, 34% of VBHS's patient revenue was subject to Medicare reimbursement and 9% was subject to Medicaid reimbursement.  In fiscal year 2004, 36% of VBHS's patient revenue was subject to Medicare reimbursement and 7% was subject to Medicaid reimbursement.  Consequently, in both fiscal year 2003, and fiscal year 2004, 43% (34% + 9% in fiscal year 2003, and 36% + 7% in fiscal year 2004) of VBHS's total annual net patient service revenue was received from the federal government.  The overwhelming majority, if not all, of these federal government funds were received as a result of charges from physicians participating in the Defendants' Physician Excess of Loss Self-Insurance Plan and Self-Insurance Trust, and VBHS's subsequent payment requests to the federal government in which VBHS affirmatively represented compliance with all applicable federal laws, rules, and regulations as a precondition for payment.

57. By conservative estimate, over the course of the last ten (10) years of Defendants' Excess of Loss program, Defendants received approximately $1,161,000,000 of Medicare and Medicaid payments for referrals from physicians participating in Defendants' Physician Excess of Loss Self-Insurance Plan and Self-Insurance Trust.

**SECOND AMENDED COMPLAINT** – Page 15

**FALSE AND FRAUDULENT CLAIMS AND STATEMENTS**

58. The physicians to whom Defendants provided illegal remuneration and kickbacks and with whom Defendants entered into illegal financial relationships referred large volumes of patients, including Medicare and Medicaid patients, to Defendants in violation of federal law. Defendants, in turn, submitted claims to Medicare and Medicaid and obtained billions of dollars worth of payments from the United States. Under the False Claims Act, 31 U.S.C. § 3729(a)(1), such claims were false and/or fraudulent because Defendants had no entitlement to payment for services provided on referrals from such physicians.

59. Defendants also violated the False Claims Act, 31 U.S.C. § 3729(a)(2), by making or causing to be made false statements when submitting these claims for payment to Medicare and other government programs. Defendants falsely certified the claims and statements were "true" and/or "correct" and as such were entitled to payment.

60. To conceal its unlawful conduct and avoid refunding payments made on the false claims, Defendants also falsely certified, that the services identified in the annual cost reports were provided in compliance with federal law, including the prohibitions against kickbacks, illegal remuneration to physicians, and improper financial relationships with physicians. The false certifications, made with each annual cost report submitted to the government, were part of Defendants' unlawful scheme to defraud Medicare and other government healthcare programs.

61. Defendants submitted and caused to be submitted false claims to Medicare and Medicaid for payment including:

      a.    falsely representing and causing others to falsely represent that the various medical services provided to patients were medically necessary.

62. Defendants submitted, and caused to be submitted false cost reports to Medicare for the years 1993 through 2004 with supporting documents and certifications in order to obtain payments from Medicare knowing that those documents included false representations including: the cost reports for 1993 through 2004 each included a certification falsely representing that services provided by the hospital were provided in compliance with pertinent laws and regulations when in fact, Defendants knew that they had violated various laws and regulations, including those pertaining to kickbacks, providing medically necessary services and the establishment of an illegal insurance program.

## AMOUNT OF MEDICARE AND MEDICAID PAYMENTS

63. As a result of Defendants' false and fraudulent claims for reimbursement, Medicare reimbursed Defendants at least $945,000,000 in Medicare monies during the period 1993 through 2004; and $216,000,000 in Medicaid monies during the period 1993 through 2004.

64. In so doing, Defendants presented, or caused to be presented, these claims with actual knowledge or their falsity, or in deliberate ignorance or reckless disregard that such claims were false and fraudulent.

## COUNT I
## FALSE CLAIMS ACT, 31 U.S.C. § 3729(a)(1)
## PRESENTING CLAIMS TO MEDICARE AND MEDICAID
## FOR SERVICES RENDERED AS A RESULT OF KICKBACKS

65. Plaintiff incorporates by reference paragraphs 1 through __ of this Complaint as if fully set forth.

66. Defendants knowingly presented, or caused to be presented, false and fraudulent claims for payment or approval to the United Sates, including claims for reimbursement for services rendered to patients unlawfully referred to Defendants' facilities by physicians and others to whom Defendants provided kickbacks and/or illegal remuneration and/or with whom Defendants entered into prohibited financial relationships in violation of the Anti-Kickback Statute.

67. By virtue of the false or fraudulent claims by Defendants, the United States suffered damages and therefore is entitled to multiple damages under the False Claims Act, to be determined at trial, plus a civil penalty of $5,000 to $10,000 for each violation.

## COUNT II
## FALSE CLAIMS ACT, 31 U.S.C. § 3729(a)(2)
## USE OF FALSE STATEMENTS

68. Plaintiff incorporates by reference paragraphs 1 through __ of this Complaint as if fully set forth.

69. Defendants knowingly made, used, and caused to be made or used, false records or statements – *i.e.*, the false certifications and representations made and caused to be made by Defendants when initially submitting the false claims for interim payments and the false certifications made and caused to be made by Defendants in submitting the cost reports — to get false or fraudulent claims paid and approved by the United States.

70. By virtue of the false and fraudulent claims made by Defendants, the United States suffered damages and therefore is entitled to multiple damages under the False Claims Act, to be determined at trial, plus a civil penalty of $5,000 to $10,000 for each violation.

# PRAYER FOR RELIEF

WHEREFORE, Plaintiff United States of America requests that judgment be entered in its favor and against Defendants Valley Baptist Health System and Valley Baptist Medical Center on the First and Second Counts under the False Claims Act for the amount of the United Status's damages, trebled as required by law, and such civil penalties as are required by law, together with all such further relief as may be just and proper.

Respectfully submitted,

WATTS GUERRA CRAFT LLP
300 Convent Street, Suite 100
San Antonio, Texas 78205
210.527.0500 - Telephone
210.527.0501 - Fax

By:    /s/ - Edward W. Allred
       Edward W. Allred
       State Bar No. 50511764
       Mikal C. Watts
       State Bar No. 20981820
       Francisco Guerra, IV.
       State Bar No. 00797784

*And*

**CHAVES, RESENDEZ & RIVERO, L.L.P.**
Frost Bank Plaza
802 N. Carancahua, Suite 2100
Corpus Christi, Texas 78470
361.884.5400 - Telephone
361. 884.5401 - Fax

       Joel C. Resendez
       State Bar No.: 16789200
       Southern Bar District ID No. 8188

ATTORNEYS FOR PLAINTIFF UNITED STATES OF AMERICA, EX REL. MICHAEL N. SWETNAM, JR.

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that the foregoing document was served on the following attorneys of record in accordance with the Federal Rules of Civil Procedure on this 7th day of January 2013:

| | |
|---|---|
| Mr. Christopher Paul Hanslik<br>Mr. Michel Perez<br>BOYAR & MILLER PC<br>4265 San Felipe, Suite 1200<br>Houston, Texas 77027<br>*Attorneys for Defendants* | *Via Electronic Filing* |
| Andrew A. Bobb<br>Assistant United States Attorney<br>Southern District of Texas<br>P O Box 61129<br>Houston, Texas 77208<br>*Attorneys for The United States of America* | *Via Electronic Filing* |
| Jon Katz<br>Joyce Branda<br>Department of Justice – Civil Division<br>Ben Franklin Station<br>P O Box 261<br>Washington, DC 20044<br>*Attorneys for The United States of America* | *Via Electronic Filing* |

/s/ - Edward W. Allred