UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, EX REL. MICHAEL N. SWETNAM, JR., | § § § | |
| Plaintiff, | § § | |
| VS. | § § | CASE NO. 1:08-CV-446 |
| VALLEY BAPTIST HEALTH SYSTEM AND VALLEY BAPTIST MEDICAL CENTER, | § § § § | |
| Defendants. | § § | |

**PLAINTIFF'S RESPONSE TO DEFENDANTS'
MOTION FOR PARTIAL SUMMARY JUDGMENT
REGARDING CLAIM FOR CERTAIN DAMAGES**

Plaintiff, the United States of America *ex rel*. Michael N. Swetnam, Jr. ("Relator") files this Response to Defendants Valley Baptist Health System and Valley Baptist Medical Center's (collectively, "VBMC" or "Defendants") Motion for Partial Summary Judgment Regarding Plaintiff's Claim for Certain Damages (the "Motion"), and in support thereof, would show the Court as follows:

## SUMMARY OF THE RESPONSE

Defendants—based on a fundamental misunderstanding of the False Claims Act ("FCA") and its interpretive case law—contend they are entitled to judgment as a matter of law because the majority of damages Plaintiff seeks purportedly are not recoverable under the FCA. Specifically, Defendants argue that (1) any civil penalties awarded under the FCA should be calculated based only on the annual hospital cost reports they submitted to the government; (2) the FCA does not permit "disgorgement" of all funds the government paid to Defendants; (3) "disgorgement" of all funds the government paid to Defendants would violate the Eighth Amendment's Excessive Fines Clause; and (4) Relator lacks standing to pursue damages based on unjust enrichment.

Defendants' arguments largely ignore the allegations in Plaintiff's Second Amended Complaint ("SAC"), as well as the undisputed facts in the case, and are wholly unsupported by the law.

This Court can and should deny Defendants' Motion on the following grounds:

- Relator is prosecuting this case and seeking damages on the Plaintiff's (the Federal Government's) behalf, as is expressly allowed by the FCA and case law;

- Plaintiff is entitled to civil penalties under the FCA for each Form UB-92 Defendants submitted to the Government, constituting a false claim for Medicare/Medicaid payment;

- Plaintiff is entitled to recover damages under the FCA equal to the full amount of monies it paid to Defendants as a result of their false certifications; and

- Defendants' Eighth Amendment attack fails because:

  o An Eighth Amendment attack at this stage is premature; and

  o Even if the Court conducts an Eighth Amendment analysis, the potential award against Defendants would not be grossly disproportionate to the gravity of their alleged offense.

## EVIDENCE IN SUPPORT OF RESPONSE

This Response is supported by the following evidence:

1. Exhibit A – Letter dated November 4, 2010 from United States Department of Justice to Joel Cruz Resendez [filed under seal];

2. Exhibit B – Form UB-92 for Medicare reimbursement;

3. Exhibit C – Deposition Testimony of William Morgan Hay;

4. Exhibit D – Expert Report of Paul C. Benoit, without exhibits [filed under seal]; and

5. Exhibit E – 1998 FULBRIGHT & JAWORSKI Letter [filed under seal].

## PURE QUESTIONS OF LAW v. FACTUAL DETERMINATIONS

Defendants assert that their Motion "presents a pure question of law . . . recoverable damages under the FCA . . . and does not ask or require this Court to make

2

any factual conclusions."  (Mot. at Pg. 2, ¶ 2; *see also id.* at Pg. 4, ¶ 7 ("Because there are no material factual issues and the question before the Court is strictly one of statutory interpretation, this motion can be decided as a matter of law.")).  Although Plaintiff agrees that most of the issues do present pure questions of law, certain factual determinations are intertwined, particularly with the civil penalties issue.  As such, Plaintiff has attached certain evidence it deems pertinent to resolving those questions of law.  Nevertheless, Plaintiff is not asking the Court to make any factual determination related to Defendants' underlying liability under the FCA.[1]

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate only if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(c).  "Under Rule 56(c), the moving party bears the initial burden of 'informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact.'"  *Employers Ins. Co. v. Penn-America Ins. Co.*, 705 F.Supp.2d 696, 704 (S.D. Tex. 2010) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  "When the moving party has met its Rule 56(c) burden . . . the nonmovant must go beyond the pleadings and designate specific facts showing that there is a genuine issue of trial.  *Id.* (citing *Duffie v. United States*, 600 F.3d 362, 370-71 (5th Cir. 2010)).  To that end, "there must be evidence on which the jury could reasonably find for the plaintiff."  *Id.*  "In deciding a summary judgment motion, the court reviews the facts drawing all reasonable inferences in the light most favorable to

---

[1] Further, despite their prior disavowing of "factual conclusions" and any reliance thereon, Defendants' Motion makes several statements of fact, which they seemingly ask the Court to take as true.  For example, Defendants claim that Relator "supported and defended the XOL Program" until the time it was terminated in 2003.  (Mot. at Pg. 3, ¶ 5).  Although not pertinent to the issues in this Motion, Relator vehemently disputes this assertion.

the nonmovant." *Id.* (citing *Chaney v. Dreyfus Serv. Corp.*, 595 F.3d 219, 229 (5th Cir. 2010)).

## ARGUMENT & AUTHORITIES

**I.    Relator Is Prosecuting this Case and Seeking Damages on the Plaintiff's (the Federal Government's) Behalf.**

Throughout their Motion, Defendants attempt to support their flawed arguments by reminding the Court that the United States Government – acting through the Department of Justice ("DOJ") – declined to intervene in this case.  (*See, e.g.* Mot. at Pg. 3, ¶ 4, Pg. 28, ¶ 27).   Defendants apparently believe that this fact weakens Plaintiff's claims, and more important to the Motion, somehow affects the damages that the Plaintiff may be awarded upon a finding of FCA liability.   In this regard, Defendants repeatedly make the incorrect statement that "Swetnam" seeks certain damages and/or that "Swetnam" is not entitled to the damages "he" seeks.  (*See, e.g. id.* at Pg.  1, ¶ 1, Pg. 4, ¶ 9, Pg. 9, ¶ 21, Pg. 10, ¶ 23).   Defendants' suppositions and misstatements in this regard are based on a fundamental misunderstanding of the FCA, its procedural mechanisms, and *qui tam* litigation.   As such, Plaintiff must set Defendants straight on this issue from the outset.

Under 31 U.S.C. § 3730(b), "a person may bring a civil action for an [FCA] violation for the person ***and for the United States Government***," and "[t]he action shall be brought in the name of the United States Government."   U.S.C. § 3730(b) (emphasis added).   Thus, a *qui tam* action allows a plaintiff to "sue[] on behalf of and in the name of the government" while the "government remains the real party in interest."   *United States ex rel. Kriendler & Kriendler v. United Techs. Corp.*, 985 F.2d 1148, 1154 (2d Cir. 1993). Further, even after an initial declination, the government retains the right to intervene at a later date upon a showing of good cause.  31 U.S.C. § 3730(c)(3).   In all events, any damages and penalties are awarded on the government's behalf, and the

government retains any such sums awarded, minus the 25 to 30 percent given to the relator for prosecuting the action.  *See id.* § 3730(d)(2).

> One court recently summarized the *qui tam* statute as follows:
>
> [W]hile the FCA gives a *qui tam* relator the statutory authority to bring suits on behalf of the United States, it is the United States, and not the *qui tam* relator, who is seeking to redress fraud on the public treasury and vindicate a personal right.  The *qui tam* relator is a representative of the United States and its interests.

*United States ex rel. Fair Lab. Pracs. Assocs. v. Quest Diagnostics Inc.*, No. 05 Civ. 5393, 2011 WL 1330542, at *7 (S.D.N.Y. Apr. 5, 2011).  Moreover, because the government "may have a host of reasons for not pursuing a claim," courts "do not assume that in each instance in which the government declines intervention in a FCA case, it does so because it considers the evidence of wrongdoing insufficient or the *qui tam* relator's allegations [of] fraud to be without merit."  *United States ex rel. Atkins v. McInteer*, 470 F.3d 1350, 1360 n. 17 (11th Cir. 2006); *see also United States ex rel. Feldman v. Van Gorp*, No. 03 Civ. 8135, 2010 WL 2911606, at *2-3 (S.D.N.Y. July 8, 2010) (holding that DOJ's decision not to intervene in action was irrelevant).

Here, in fact, the DOJ acknowledged these statutory realities in a letter to Relator's counsel after the Government chose not to intervene in the case.  (*See* Ex. A).  First, the DOJ noted that although the United States was not a litigant to the instant action, it "remains the real party in interest, entitled to the majority of any damages and penalties recovered on its behalf."  (*Id.* at Pg. 1).  Second, the DOJ stated that its decision to decline intervention "should not be construed as a statement about the remaining allegations," and that it retained the right to intervene at a later date.  (*Id.*).  Finally, the DOJ reminded Plaintiff that any settlement and corresponding dismissal of the action requires Government approval.  (*Id.* at Pg. 2 (citing 31 U.S.C. § 3730(b)(1))).

Accordingly, contrary to Defendants' contentions, Relator here is not bringing this suit and seeking damages on his own behalf, but instead on behalf of the real Plaintiff in interest, the United States Government.  As will be explained in more detail below, any and all damages and penalties sought in the SAC are those that have been incurred by the United States Government as a result of the United States Government's payment of Defendants' false claims.  Stated simply, Defendants' Motion gains no legal traction whatsoever from relying on the Government's decision not to intervene in this action.  To the extent Defendants raise this argument with respect to any specific issue, Plaintiff will further address the same below.

II.   **Plaintiff Is Entitled to Civil Penalties Under the FCA for Each UB-92 Form Defendants Submitted to the Government, Constituting A False Claim for Medicare/Medicaid Payment.**

Defendants first attack the civil penalties Plaintiff seeks on the Government's behalf under the FCA.  (Mot. at Pgs. 7 – 8).  Specifically, Defendants contend that any penalties awarded can be based only on the single hospital cost report VBMC submitted to the government during the period of October 9, 2002 to April 15, 2003.[2]  In essence then, Defendants argue that this single cost report is the only false "claim" it submitted during the applicable time period.  Defendants' argument ignores the facts, Plaintiff's allegations in the SAC, and a plethora of case law.

Under the FCA, the Government is entitled to recover between $5,000 and $10,000 for each fraudulent claim.  31 U.S.C. § 3729(a).  As such, "[t]he FCA permits recovery of multiple penalties, where a defendant has submitted several different fraudulent claims."  *Kelsoe v. Fed. Crop Ins. Corp.*, 724 F. Supp. 448, 453 (E.D. Tex. 1988).  The legislative history of the 1986 amendments makes clear that penalties are

---

[2] Although the false claims began in 1993, based on the Court's prior statute of limitations ruling the parties agree that Defendants' FCA liability and the Government's resulting damages is limited to claims for payment submitted between October 9, 2002 and April 15, 2003.

"automatic and mandatory for each claim which is false."  S.Rep. No. 345, 99th Cong., 2d Sess. 8 (1986).  The primary question, therefore, is what constitutes an FCA "claim."

The FCA broadly defines "claim" as "any request or demand, whether under a contract or otherwise, for money or property . . . presented to . . . the United States."  *Id.* § 3729(c).  "Whether a defendant has made one false claim or many is a fact-bound inquiry that focuses on the specific conduct of the defendant."  *U.S. v. Krizek*, 111 F.3d 934, 939 (D.C. Cir. 1997).  As the Supreme Court has instructed, for the purpose of assessing penalties in FCA cases "the focus . . . [must] be upon the specific conduct of the person from whom the Government seeks to collect the statutory forfeitures." *United States v. Bornstein*, 423 U.S. 303, 313 (1976).  Accordingly, the Court asks, "[w]ith what act did the defendant submit his demand or request and how many such acts were there?" *Krizek*, 111 F.3d at 939.  Further, "[t]he question turns, not on how the government chooses to process the claim, but on how many times the defendants made a 'request or demand.'" *Id.* at 940 (citing 31 U.S.C. § 3729(c)).

In their Motion, Defendants make the brazen claim that Plaintiff "does not allege that any single reimbursement request that [VBMC] submitted to the government was fraudulent," and that therefore "this lawsuit does not involve fraudulent reimbursement requests."  (Mot. at Pg. 7, ¶ 16).  These statements are blatantly false and belied by the allegations in the SAC.  Indeed, the SAC – in great detail – explains how hospitals, including VBMC, submit an initial reimbursement request to the Government through a Form UB-92 (also known as HCFA 1450) (*See* Ex. B)[3] for each Medicare beneficiary patient upon the conclusion of each episode of care.  (SAC at ¶¶ 18, 22).[4]

---

[3] Relator recently submitted requests for production to Defendants seeking all UB-92's they submitted to the Government during the applicable time period.  Assuming these documents are produced timely, Relator will attach a representative example with his Sur-reply.

[4] This Court described the UB-92 process in *U.S. ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 20 F. Supp. 2d 1017, 1024 (S.D. Tex. 1998) as follows:

More specifically, the SAC states that "[d]uring the relevant time period, Medicare payments for hospital services were determined by the claims submitted by [VBMC] for particular patient discharges (specifically listed on UB-92s) during the course of the fiscal year." (*Id.* at ¶ 22). Defendants' former Chief Financial Officer, William Morgan Hay, during his recent deposition testimony, confirmed the SAC's allegations regarding VBMC's submission of UB-92 forms. (*See* Ex. C at Pgs. 9 – 13). The SAC then goes on to discuss VBMC's submission of hospital cost reports (CMS-2552 forms) at the end of each year to reconcile any under or over payment from the previously filed UB-92's (*Id.* at ¶¶ 19, 20, 22).

After explaining the Defendants' XOL Program and their violation of the Anti-kickback Statute ("AKS"), the SAC ties this to Defendants' demand and receipt of Medicare and Medicaid funds from the Government, stating that "[t]he overwhelming majority, if not all, of these federal government funds were received as a result of charges from physicians participating in the Defendants' [XOL Program], and [VBMC's] *subsequent payment requests* to the federal government in which [VBMC] represented compliance with all applicable federal laws, rules and regulations as a precondition for payment. (*Id.* at ¶ 56 (emphasis added); *see also id,* at ¶ 58 ("Defendants, in turn, *submitted claims* to Medicare and Medicaid and obtained billions of dollars worth of payments from the United States.") (emphasis added)). These "payment requests" and "submitted claims" refer directly to the UB-92 forms Defendants submitted to the Government during the applicable time period. (*See id.* at ¶ 69 ("Defendants knowingly made, used, and caused to be made or used, false records or statements – i.e. the false

---

A hospital bills for both inpatient and outpatient services to its Medicare fiscal intermediaries shortly after providing services to a patient. The billing information is submitted . . . on a "UB-92" form. The hospital submits a separate UB-92 form for each patient and each episode of care.

*Id.*

certifications and representations made and caused to be made by Defendants *when initially submitting the false claims for interim payments* . . . .") (emphasis added)).[5] Contrary to Defendants' contention then, Plaintiff does allege that each of these individual reimbursement requests (UB-92's) were fraudulent based upon Defendants' violation of the AKS and false certifications[6] that they were complying with all applicable laws in seeking Medicare/Medicaid payments.  (SAC at ¶¶ 58 – 60, 66, 69).

Courts—almost uniformly—have held that each submission of a UB-92 form constitutes a separate "claim" for FCA purposes.  *See Krizek*, 111 F.3d at 940 (Defendant "made a request or demand every time they submitted an HCFA 1500[7] [form]."); *U.S. ex rel. Hawaii v. Hawaii Pacific Health*, 409 Fed. Appx. 133, 134 (9th Cir. 2010) (recognizing that submission of UB-92 forms would constitute false claims if any specific statue or regulation rendered them false); *United States ex rel. Monahan v. Robert Wood Johnson Univ. Hosp.*, No. 02-5702, 2009 WL 1288962, at *6 (D. N.J. May 7, 2009) ("Defendant submitted [UB-92] forms to the Medicare program which satisfies the first prong . . . of the FCA."); *United States v. Rogan*, 459 F. Supp. 2d 692, 717 (N.D. Ill. 2006) ("The submission of UB-92s in violation of the Stark Statute [and AKS] constitutes a violation of the FCA."); *In re Cardiac Devices Qui Tam Litigation*, 221 F.R.D. 318, 343 – 44 (D. Conn. 2004) ("[D]efendants' submission of Form HCFA 1450 (UB-92) clearly constituted the submission of a 'claim' to the United States government."); *see also United States ex rel. Fry v. Health Alliance of Greater Cincinnati*, No. 1:03-CV-00167, 2008 WL 5282139, at *12 (S.D. Ohio Dec. 18, 2008) (holding that the Government adequately alleged a FCA violation for presenting claims for reimbursement to Medicare which were tainted by

---

[5] Although the SAC does refer to the hospital costs reports in great detail, nothing in the SAC limits Defendants "submitted claims" and "payment requests" to those alone.

[6] Any signatory to a UB-92 form expressly certifies that he or she understands that any "false claim" or "concealment of a material fact, may be prosecuted under applicable Federal or State laws."  (Ex. B at Pg. 2, ¶ 8).

[7] HCFA 1500 is the form used for individual physicians, where as HCFA 1450 (UB-92) is used by institutional providers (i.e. hospitals) like VBMC.

AKS violations); U.*S. ex rel. Tyson v. Amerigroup Illinois, Inc.*, 488 F. Supp. 2d 719, 741 (N.D. Ill. 2007) (holding that each submission of forms CMS-37 and CMS-64 constituted a separate claim, resulting in 18,139 claims for purpose of the FCA); *U.S. v. Bondar*, No. 03-C-1248, 2006 WL 2527633, at *3 (E.D. Wis. Aug. 29, 2006) (holding that each submission of a Medicaid CRU 210 form constituted a separate false claim).

In fact, the District Court of South Carolina recently rejected the very same argument made by Defendants here – that only hospital cost reports constitute "claims" upon which FCA penalties can be based.  *See United States ex rel. Drakeford v. Toumey*, 976 F. Supp. 2d 776, 794 (D.S.C. 2013).  In so doing, the Court upheld the jury's finding that, based upon the UB-92 forms, the defendant had submitted 21,730 false claims[8], and entered a civil penalty award for $237,454,195.00 ($5,500 X 21,730 X 3 (trebled)).  *Id.* ("The court has found that a reasonable jury could conclude the existence of 21,730 false claims.").

Like *Toumey* – and based on the additional overwhelming case law – Defendants here made a false claim to the Government each time they submitted a UB-92 form for reimbursement.[9]  Therefore, as a matter of law, the Government is entitled to an "automatic and mandatory" penalty award for each submitted UB-92 form.  *See* S.Rep. No. 345, 99th Cong., 2d Sess. 8 (1986).  Accordingly, Defendants' Motion as to this issue must be denied, and Plaintiff's "automatic and mandatory" statutory penalties must be calculated using each UB-92 form the Defendants submitted for payment between October 9, 2002 and April 15, 2003.

---

[8] Almost identical to the present case, the relator's FCA theory in *Toumey* was based on false certifications in violation of the Stark laws.  *Id.* at 780.

[9] As set forth in the Expert Report of Paul C. Benoit, Defendants submitted approximately 31,056 claims. (*See* Ex. D at Pg. 14, ¶ 30).

III.    **Plaintifff Is Entitled to Recover Damages Under the FCA Equal to the Full Amount of Monies It Paid to Defendants as a Result of Their False Certifications ("Recoupment Damages").**

Defendants next attack the actual damages sought by the Government[10] in this action, arguing that the FCA does not permit the remedy of "disgorgement."  (Mot. at Pgs. 9 – 13).  Despite the SAC never mentioning "disgorgement," Defendants selectively use this term[11] in an effort to hide the ball and ignore black letter law with respect to the actual damages the Government may recover under the FCA.  Indeed, Defendants run down a rabbit trail of purported differences between damages and "disgorgement," while turning a blind eye toward the simple nature of the damages the Government seeks.  Regardless of the technical term used, the Government here is entitled to recover every penny it paid to Defendants as a result of false claims they submitted – money it would not have paid Defendants on their Medicare/Medicaid claims had it known about the illegal kickback scheme.

The Fifth Circuit, relying on Supreme Court precedent, has long held that the FCA "reaches . . . to all fraudulent attempts to cause the Government to pay out sums of money."  *Peterson v. Weinberger*, 508 F.2d 45, 52 (5th Cir. 1975) (citing *United States v. Neifert-White Co.*, 390 U.S. 228, 233 (1968)).  However, the plain language of the FCA does not contain any formula for courts to apply when assessing actual damages, nor is any formula apparent from the statutory framework.  *See* 31 U.S.C. § 3729, *et seq.*

---

[10] Defendants again attempt to paint the picture here that Relator seeks such damages only for himself. (Mot. at Pg. 9, ¶ 21 ("Swetnam seeks as damages a disgorgement from [VBMC].").  As set forth in Section I above, this assertion is false.

[11] Defendants no doubt are seizing on Relator's damages expert, Paul C. Benoit's, use of term "disgorgement" in his expert report.  (*See, e.g.* Ex. D at Pg. 14, ¶ 31).  Contrary, to Defendants' assertion, however, and as explained more fully below, Mr. Benoit is not using the term to establish some form of extraordinary or equitable remedy separate and apart from the actual damages sustained by the Government.  In any event, Mr. Benoit currently is amending his report, which will replace the term "disgorgement" with "recoupment" in order to better describe the damages the Government seeks in this action.

Nevertheless, the broad application of the FCA applies equally to the determination of damages, as the legislative history clearly shows:

> No single rule can be, or should be, stated for the determination of damages under the Act.  [C]ourts should remain free to fashion measures of damages on a case by case basis . . . [and] should be guided only by the principles that the United States' damages should be liberally measured to effectuate the remedial purposes of the Act, and that the United States should be afforded a full and complete recovery of all its damages.

S.Rep. No. 96-615, at 4 (1980); *see also Coleman v. Hernandez*, 490 F. Supp. 2d 278, 281 (D. Conn. 2007) ("There is no simple rule for calculating the government's damages under the False Claims Act.  The purpose of the statute is to make the government whole.").

Accordingly, the Fifth Circuit has held that "damages under the [FCA] must be measured by the amount wrongfully paid to satisfy the false claim."  *United States v. Aerodex, Inc.* 469 F.2d 1003, 1011 (5th Cir. 1972); *see also United States v. Science Applications Int'l Corp*, 626 F.3d 1257, 1279 (D.C. Cir. 2010) ("In calculating FCA damages, the fact-finder seeks to set an award that puts the government in the same position as it would have been if the defendant's claims had not been false.").  In cases "where there is no tangible benefit to the government and the intangible benefit is impossible to calculate, it is appropriate to value damages in the amount the government actually paid to the [d]efendants."  *United States ex rel. Longhi v. Lithium Power Techs., Inc.*, 575 F.3d 458, 473 (5th Cir. 2009).

*Longhi* is particularly instructive here.  In that case, the Government brought an FCA action against the defendants for false statements made in connection with applications they submitted for certain research grants.  *Id.* at 462 – 64.  On summary judgment, the district court held that the Government suffered damages in the ***full amount of the grants it paid to the defendants*** as a result of their deceptive applications.  *Id.* at 472.  On appeal, the defendants argued that the Government was

not entitled to damages because it did not suffer an "injury," and that the district court erred in granting the damages award because "no court has ever applied a fraudulent inducement/disgorgement theory in the absence of some tangible injury to the government." *Id.* at 473.  The Fifth Circuit flatly rejected this argument and upheld the district court's award, holding that "a direct casual relationship existed between the funds received by the [d]efendants and their false statements." *Id.*

Just like *Longhi*, there is a direct casual relationship between the federal funds VBMC received from the Government and their false certifications that they were complying with all existing laws – including the AKS.  Because there is no tangible benefit to the Government in paying/reimbursing Medicare claims, the proper measure of damages is the full amount the Government paid as a result of the false claims. *See Longhi*, 575 F.3d at 473.  "[H]ad the government known about the referral inducement program[] alleged in the amended complaint, the government [would] have rejected payment of claims tainted by [that] program[]."  *United States ex rel. Daugherty v. Bostwick Labs.*, No. 1:08-CV-00354, 2012 WL 6593804, at *11 (S.D. Ohio Dec. 12, 2012). Indeed, "the Government does not get what it bargained for when a defendant is paid by CMS for services tainted by a kickback."  *United States ex rel. Westmoreland v. Amgen, Inc.*, 812 F. Supp. 2d 39, 5 (D. Mass. 2011) (internal citations omitted).

Further, federal courts throughout the country have embraced this damage model in FCA cases involving Medicare payments made as a result of false claims.  *See United States v. Rogan*, 517 F.3d 449, 543 (7th Cir. 2008) (affirming district court's damage award based on the full amount the Government paid defendant for Medicare claims rendered false by violations of the AKS); *United States ex rel. Freedman v. Suarez-Hoyos*, No. 8:04-cv-933-T-24, 2012 WL 4344199, at *3 (M.D. Fla. Sept. 21, 2012) ([T]he Court concludes that, assuming the Government proves that it paid claims that were tainted

by a kickback arrangement and that it would not have paid such claims had it known the truth, the amount of the Government's damages resulting from the payment of such claims **equals the full amount that Medicare** **paid**." (emphasis added)); *see also United States ex rel. Feldman v. Van Gorp*, 697 F.3d 78, 88 (2d Cir. 2012) (upholding the district court's award of damages "equal to the full amount of grants awarded to the defendants based on their false statements" because "the defendants fraudulently sought payments for participating in programs designed to benefit third parties rather than the government itself, and the government received nothing of tangible value from the defendant[s]."); *Science Applications Int'l Corp*, 626 F.3d at 1279 ("In some cases, such as where the defendant fraudulently sought payment for participating in programs designed to benefit third-parties rather than the government itself, the government can easily establish that it received nothing of value from the defendant and that all payments made are therefore recoverable as damages."); *McNutt ex rel. United States v. Haleyville Med. Supplies, Inc.*, 423 F.3d 1256, 1259 (11th Cir. 2005) ("When a violator of government regulations is ineligible to participate in a government program and the violator persists in presenting claims for payment . . . that violator is liable, under the Act, for its submission of those false claims."); *United States ex rel. Humane Society v. Hallmark Meat Packing Co.*, No. EDCV 08-00221-VAP, 2013 5753784, at *8 (C.D. Cal. Apr. 30, 2013) ("Where a case involves false certification of compliance with a legal requirement that is material to the Government's decision making, the general rule of damages . . . is the difference between what the Government paid over and above what it would have paid if the certification had been truthful."); *United States ex rel. Liotine v. CDW Government, Inc.*, No. 05-33-DRH, 2012 WL 28007040, at *11 (S.D. Ill. July 10, 2012) ("[Defendant] is not entitled to keep money obtained from the government under false pretenses."); *United States ex rel. Antidiscrimination Center of Metro N.Y. v. Westchester*

14

*County*, No. 06 Civ. 2860, 2009 WL 1108517, at *3 (S.D.N.Y. Apr. 24, 2009) (rejecting the defendant's contention that the benefit-of-the-bargain theory of damages applied because the defendant was "much more akin to the defendant[] in *Rogan* . . . who made false claims in order to receive what was essentially a 'subsidy' from the federal government.").[12]

Ignoring almost all of this precedent, Defendants contend that *Rogan* is the only case where a Court has awarded the type of damages the Government seeks in this case. (Mot. at Pg. 12, ¶ 28). As just shown, that contention is patently false. In any event, Defendants' attempt to distinguish *Rogan* fails miserably. First, Defendants argue that in *Rogan*, it was the Government that prosecuted the action and was awarded the "disgorgement" damages. As explained in Section I, however, this is a distinction without a difference because here Relator is prosecuting the action and seeking damages on the Government's behalf. Second, Defendants claim that *Rogan* "involved allegations of criminal conduct." Although it is true that the alleged co-conspirators were indicted for criminal conduct, the defendant was not. *Rogan*, 517 F.3d at 451. In fact, the FCA violation alleged against the defendant was almost identical to that alleged against VBMC here – false Medicare claims based on violations of the AKS. *Id.* at 451 – 52.

Finally, Defendants argue that *Rogan* is different because "the government alleged that the defendant submitted claims to Medicare and Medicaid for services that either had not been performed or were not necessary." But this fact had little bearing

---

[12] Defendants' citation to *Cook County v. United States ex rel. Chandler*, 538 U.S. 119, 131 (2003) and *Mortgages, Inc. v. United States Dist. Court for the Dist. of Nex.*, 934 F.3d 209, 213 (9th Cir. 1991) for the proposition that "courts narrowly construe[] 'damages' to mean some form of 'actual damages'" is both irrelevant and misleading. The Supreme Court in *Cook County* merely noted that the FCA does not expressly provide for the recovery of prejudgment interest or consequential damages – neither of which the Government seeks here. In *Mortgages*, the Ninth Circuit held simply that the FCA does not provide a cause of action for contribution or indemnity for a ***defendant*** against a *qui tam **plaintiff***. Neither case has any bearing on the issue of the Government's damages in this case.

on the Seventh Circuit upholding the damages award, as the Court stated: "[n]or do we think it important that *most* of the patients for which claims were submitted received some medical care – perhaps all the care reflected in the claim forms."   *Id.* at 453 (emphasis added).   Indeed, as the *Rogan* Court explained, contrary to Defendants' argument, the fact that VBMC provided the medical services that the government reimbursed, that the medical services were billed at the appropriate amounts, and that the provided medical services were necessary does not affect the damages the Government may recover:

> [Defendant] did not furnish any medical services to the United States.  The government offers a subsidy (from the patients' perspective, a form of insurance), with conditions.   When the conditions are not satisfied, nothing is due.  Thus the entire amount that [Defendant] received on these 1,812 claims must be paid back.   Now it may be that, if the patients had gone elsewhere, the United States would have paid for their care.   Or perhaps the patients, or a private insurer, would have paid for care at [Defendant] had it refrained from billing the United States.  ***But neither possibility allows [Defendant] to keep money obtained from the Treasury by false pretenses, or avoid the penalty for deceit*.**"

*Id.* at 453 (emphasis added); *see also United States v. Mackby*, 339 F.3d 1013, 1018 (9th Cir. 2003) ("The fact that [defendant's] clinic actually performed the physical therapy for which he claimed reimbursement does not eliminate the government's injury."); *cf. Toumey*, 976 F. Supp. 2d at 788 ("Such a result is contrary to the plain wording of the statute, which prohibits payment of claims if those claims are the result of referrals from physicians with whom the hospital has a financial relationship, and mandates the refund of any amounts so collected.").   Moreover, Congress specifically rejected this "no harm, no foul" argument Defendants raise here:   "[a] false claim for reimbursement under the Medicare, Medicaid or similar program is actionable under the act, . . . and such claim[] may be false even though the services are provided as claimed if, for example, the claimant is ineligible to participate in the program . . . ."   S.Rep. No. 99-345, at 9.

In summary, the Government simply seeks to recover the money it paid to Defendants as a result of their false UB-92 form claims.  The Fifth Circuit, as well the vast majority of other federal courts, have utilized and/or upheld this damages model in cases of this kind.  Accordingly, Defendants' Motion must be denied.

## IV.   Defendants' Eighth Amendment Attack Fails.

Finally, Defendants argue that the Government recouping all of the money it paid to Defendants as a result of their false UB-92 form claims would violate the Eighth Amendment's excessive fines clause.  (Mot. at Pgs. 13 – 15).  This argument fails for two reasons.  First, an Eighth Amendment attack is premature at this stage where the jury has yet to determine any amount of damages.  Second, even if the jury awards the Government the full amount of the damages sought, such amount would not be grossly disproportionate to Defendants' offense.  Either way, Defendants' Motion must be denied.

### A.   An Eighth Amendment Attack at this Stage Is Premature.

"[C]ourts agree that a pretrial motion asserting the protections of the Excessive Fines Clause prior to [a] . . . final forfeiture order is simply premature."  *United States v. Diamond Casino Cruise, LLC*, No. CR412-141, 2013 WL 54001, at *1 (S.D. Ga. Jan. 3, 2013); *see also United States v. Talebnejab*, 460 F.3d 563, 573 (4th Cir. 2006) (agreeing with district court that pre-trial Eighth Amendment challenge to forfeiture allegations was "not yet ripe."); *Cheffer v. Reno*, 55 F.3d 1517, 1523 (11th Cir. 1995) ("Eighth Amendment challenges are generally not ripe until the imposition . . . of a challenged punishment or fine.").  Indeed, "[b]efore evaluating whether the size of a forfeiture is excessive, a court must first [know] how much of the property will actually be forfeited."  *United States v. 434 Main St., Tewksbury, Mass.*, 862 F. Supp. 2d 24, 35 (D. Mass. 2012); *see also United States v. $11,552.73 in U.S. Currency*, No. 07-11759-PBS, 2009 WL 2045340, at *1 (D. Mass.

June 10, 2009) (The issue of whether an fine is excessive under the Eighth Amendment "is not decided by the court until after a finding of forfeitability.").  This is because "the contours of the offense must first be established before a court can determine if the fine imposed in unconstitutionally excessive."  *United States ex rel. v. M&T Mortgage Corp.*, 518 F. Supp. 2d 108, 124 (D.D.C. 2007).

At trial, the jury in this action will have the opportunity to decide Defendants' liability, as well as determine the amount of damages that the Government should be awarded.  Until that time, this Court has no way to determine what the amount of damages, if any, will be.  Accordingly, based on the authorities cited above, any constitutional attack on the Government's potential damage award is premature and not yet ripe.  *See Ashwaner v. TVA*, 297 U.S. 288, 345 – 47 (1936) (Brandies, J., concurring) (noting that courts should avoid unnecessarily deciding constitutional questions.)  Defendants' Motion should be denied for this reason alone.

> **B.**     **Even if the Court Prematurely Conducts an Eighth Amendment Analysis, the Potential Award Against Defendants Would Not Be Grossly Disproportionate to the Gravity of Their Alleged Offense.**

Even if the Court decides to conduct an Eighth Amendment analysis of the potential damages award the Government might receive in this case – which it should not – Defendants' argument still fails because the potential award against Defendants would not be grossly disproportionate to the gravity of their alleged offense.  "The touchstone of the constitutional inquiry under the Excessive Fines Clause is the principle of proportionality: The amount of forfeiture must bear some relationship to the gravity of the offense that it is designed to punish."  *United States v. Bajakajian*, 524 U.S. 321, 334 (1998).  As such, the Supreme Court has held that "a punitive forfeiture violates the Excessive Fines Clause [only] if it is grossly disproportional to the gravity of a defendant's offense."  *Id.*

As an initial matter, Defendants' Eighth Amendment argument attacks only the potential ***actual damages*** the Government might be awarded in this action (i.e. all the amounts the Government paid to VBMC for false Medicare/Medicaid claims) – ***not*** the potential penalty award under the FCA.  (Mot. at Pg. 13, ¶ 29).  But the Supreme Court has clearly stated that the Excessive Fines Clause applies only to "punitive forfeitures." *Bajakajian*, 524 U.S. at 334.  Because the Government's potential ***actual*** damages award is not a ***punitive*** forfeiture, Defendants' Eighth Amendment attack fails as a matter of law.

In all events, Defendants have failed to meet their burden of proving that any potential damages award to the Government – whether actual damages or statutory penalties – would be grossly disproportional to the gravity of Defendants' offense.  *See Tyson*, 488 F. Supp. 2d at 744 ("In an Excessive Fines Clause inquiry, the burden rests on the defendant.").   Defendants present four factors they claim courts consider in determining whether a fine is grossly disproportional, including (1) the extent of the harm caused; (2) the gravity of the offense relative to the fine; (3) whether the violation was related to other illegal activity, and the nature and extent of that activity; and (4) the availability of other penalties and the maximum penalties which could have been imposed.  (Mot. at Pg. 13, ¶ 30).[13]  All of these factors weigh heavily against a finding of gross disproportionality.

First, contrary to Defendants' contention, and as clearly set forth in Section III above, the Government suffered immense economic harm in paying millions of dollars worth of false Medicare and Medicare claims that it would not have paid had it known about Defendants' illegal kickback scheme.  Second, the gravity of Defendant's offense –

---

[13] Defendants cite only *United States v. 3814 NW Thurman St., Portland, Or.*, 164 F.3d 1191, 1197 – 98 (9th Cir. 1999) as authority for the purported list of factors.  Relator, however, was unable to locate any Fifth Circuit case where a court utilized these factors in assessing a civil damages award under the Excessive Fines Clause. This Court, therefore, is not bound by the Defendants' list of proposed factors.

*knowingly* operating an illegal kickback scheme since at least 1998 (*See* SAC at ¶¶ 47 – 54),[14] and possibly as far back as 1993, while continuing to submit Medicare/Medicaid claims tainted thereby – relates directly to the Government's potential damages, particularly where, as here, the Government can only be awarded damages based on *six (6) months* worth of Defendants' illegal conduct *that in fact continued for ten (10) years*, from 1993 until 2003.[15]   Third, Defendants' FCA violation is related directly to other illegal activity – violation of the AKS.[16]   Finally, other than the FCA and the damages and penalties the Government may recover thereby, there are no other remedies available to the Government.

Accordingly, Defendants' Eighth Amendment attack fails, and their Motion, therefore, should be denied.[17]

## CONCLUSION AND PRAYER

WHEREFORE, Plaintiff requests that Defendants' Motion be denied in full, and that Plaintiff be granted such other and further relief to which it may be justly entitled.

Respectfully submitted,

---

[14] *See*, Exhibit E, letter dated May 11,1998, from the law firm of FULBRIGHT & JAWORSKI identifying legal concerns relating to the XOL Program at issue in this litigation

[15] Indeed, allowing the maximum statutory penalty for each UB-92 form submitted between October 9, 2002 and April 15, 2003 would only allow the Government to recover for approximately 5% (6 months/120 months = 0.05) of the time period that Defendants submitted false UB-92 forms for payment. If the May 18, 1998 (the date of the FULBRIGHT & JAWORSKI letter) date is used as the beginning of the Defendant's knowing conduct, then allowing the maximum statutory penalty for each UB-92 form submitted after that letter until April 15, 2003 would still only allow the Government to recover for less that 50% (59 months/120 months = 0.49) of the time period that Defendants knowingly submitted false UB-92 forms.  The gravity and pervasive nature Defendants' offenses is evidenced by the fact that they submitted *31,056* false UB-92 forms in only six (6) months, *averaging over 5,000 false claims submitted each month.*

[16] In arguing the third and fourth factors, Defendants claim that "Swetnam is the party who engaged in and who was incarcerated for illegal activity."  (Mot. at Pg. 15, ¶ 33, 34).  Even if this had any bearing on the Court's analysis – which it should not – Defendants' claim contradicts the undisputed facts which they admit earlier in their own Motion – that "[t]he insurance fraud scheme that resulted in Swetnam being incarcerated *is unrelated to* the malpractice insurance subsidy program at issue in this lawsuit." (Mot. at Pg. 2, ¶ 3, n. 4).

[17] Plaintiff has not responded to Defendants' attack of unjust enrichment damages because, as will be seen in the amended expert report of Paul C. Benoit, Plaintiff no longer seeks any damages based on an unjust enrichment theory.

WATTS GUERRA LLP
300 Convent Street, Suite 100
San Antonio, Texas 78205
210.527.0500 - Telephone
210.527.0501 - Fax


By:      /s/ - Edward W. Allred
         Edward W. Allred
         State Bar No. 50511764
         Mikal C. Watts
         State Bar No. 20981820
         Francisco Guerra, IV.
         State Bar No. 00797784

*And*

CHAVES, RESENDEZ & RIVERO, L.L.P.
Frost Bank Plaza
802 N. Carancahua, Suite 2100
Corpus Christi, Texas 78470
361.884.5400 - Telephone
361. 884.5401 - Fax

         Joel C. Resendez
         State Bar No.:  16789200
         Southern Bar District ID No. 8188

ATTORNEYS   FOR   PLAINTIFF   UNITED
STATES OF AMERICA, EX REL. MICHAEL N.
SWETNAM, JR.

### CERTIFICATE OF SERVICE

The undersigned hereby certifies that the foregoing document was served on the following attorneys of record in accordance with the Federal Rules of Civil Procedure on this 19th day of June, 2014:

Mr. Christopher Paul Hanslik                    *Via Electronic Filing*
Mr. Michel Perez
BOYAR & MILLER PC
4265 San Felipe, Suite 1200
Houston, Texas 77027
*Attorneys for Defendants*

Andrew A. Bobb                                   *Via Electronic Filing*
Assistant United States Attorney
Southern District of Texas
P O Box 61129
Houston, Texas 77208
*Attorneys for The United States of America*

Jon Katz                                          *Via Electronic Filing*
Joyce Branda
Department of Justice – Civil Division
Ben Franklin Station
P O Box 261
Washington, DC 20044
*Attorneys for The United States of America*

_/s/ - Edward W. Allred_